UNITED STATES of America,
Plaintiff-Appellee,

v.

Noble C. BEASLEY,
Defendant-Appellant.

No. 77–5302.

United States Court of Appeals,
Fifth Circuit.

July 13, 1978.

Jonathan Shapiro, Boston, Mass., for defendant-appellant.

Wm. A. Kimbrough, Jr., U. S. Atty., William R. Favre, Jr., Asst. U. S. Atty., Mobile, Ala., for plaintiff-appellee.

Before SKELTON [*], Senior Judge, and FAY and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

For the third time,[1] we consider the conviction of Noble C. Beasley for willful evasion of income taxes for the year 1971[2] and for conspiracy with three others to distribute heroin in Mobile County, Alabama. This review centers on whether there was a violation of the Jencks Act[3] as a result of the government's failure, albeit in good faith, to produce pre-trial statements given by a key prosecution trial witness and whether the scope of cross-examination of that witness at trial was unduly restricted. Because, under the Jencks Act, we consider results, not motive, we conclude that the government violated its statutory duty, however innocently, in failing to produce statements in the possession of a government department. We conclude that, despite the good faith effort of the U.S. Attorney to comply with the statutory mandate, and the diligence of the trial judge who conducted with fairness not only a lengthy trial but also an exhaustive post-conviction hearing, the defendant is entitled to a new trial on the heroin conspiracy charge. Because, however, we find that the failure to produce was harmless beyond reasonable doubt with respect to the tax evasion conviction, we affirm that conviction. Attempting to avoid reiteration so far as possible, we now relate the reasons for these conclusions.

### I.

The heroin conspiracy count was supported principally by the testimony of two government witnesses referred to in our prior opinion: Dickie Diamond, who related at length and in detail his own sales of heroin to Beasley; and Barbara Heron, who had once borne Beasley a child, and who confirmed some of Diamond's account, and testified further that she had acted as a heroin courier for Beasley in transactions outside the scope of the conspiracy, and indeed designed to eliminate Diamond's role as Beasley's supplier. A careful examination of the lengthy record satisfies us that Mrs. Heron's testimony was ample to show a source of illicit income, but was not, by itself, adequate to support the jury verdict beyond reasonable doubt on the heroin conspiracy charge. Mrs. Heron testified that Beasley was engaged in selling narcotics, that he obtained a supply at one time from Diamond, and that she later established another contact, and brought further supplies directly to Beasley. But she did not testify to facts that would sufficiently prove the conspiracy charged to have existed among Beasley, James H. Finley, Roy S. Matthews, and Reginald Wilson. She was able only in part to corroborate Diamond's testimony; she did know the co-conspirators; she did

---

[*] Senior Judge of the United States Court of Claims, sitting by designation.

1. *United States v. Beasley,* 5 Cir. 1975, 519 F.2d 233, *vacated,* 1976, 425 U.S. 956, 96 S.Ct. 1736, 48 L.Ed.2d 201; 5 Cir. 1976, 535 F.2d 293.

2. He had also been convicted of filing a false return for the same year. This being a lesser included offense, the conviction has been vacated. *United States v. Beasley, supra,* note 1, 519 F.2d at 249.

3. 18 U.S.C. § 3500.

know that they were Beasley's friends, and she was able to confirm various aspects of Diamond's account.

Thus, Diamond's testimony was indispensable. Had he not testified at all, and had the government put on its case, just as it did, but *sans* Diamond, the trial judge would have been obliged to direct a verdict on the heroin conspiracy count. For this reason, Diamond's credibility was also crucial.

Prior to and during the trial, the defense sought to obtain Diamond's Jencks Act statements. The Assistant U.S. Attorney performed his duty in this regard with commendable zeal. He produced a statement given by Diamond to an Internal Revenue Service agent named Doyle Coats in New York, on April 24, 1973. Diamond had said nothing to Coats about any prior statement. Because the case had originated as an Internal Revenue Service prosecution, the Assistant U.S. Attorney had not worked with Drug Enforcement Administration (DEA) agents, but he did attempt to determine from that agency whether it had any Jencks Act material. He was told that there was none; he so informed the court, and he produced no material from that agency.

Beasley sought a writ of certiorari from the Supreme Court to review his conviction. While the application for the writ was pending, an attorney in the Office of the Solicitor General, at the request of Beasley's counsel, made another inquiry of the DEA office in New York. As a result of a computer check, that office located a statement made by a DEA inspector Mortimer L. Benjamin recounting the results of interviews with Diamond held on March 16 and March 20, 1972 in a state penal institution and in the presence of another DEA agent, Weiser. Whether this statement (the Benjamin statement) was within the scope of the Jencks Act is an issue we will discuss below.

The Solicitor General suggested that the Benjamin statement might be Jencks Act material, and that the Supreme Court should grant the writ and remand the case. Responding to this suggestion, the Supreme Court in *Beasley v. United States*, 1976, 425 U.S. 956, 96 S.Ct. 1736, 48 L.Ed.2d 201, vacated the judgment and remanded the case "for further consideration in the light of the position presently asserted by the government." Upon reconsideration, we stated, "The facts revealed by the Solicitor General's investigation raised serious questions as to the correctness of the original rulings on the Jencks Act and cross-examination grounds . . . ." *United States v. Beasley*, 5 Cir. 1976, 535 F.2d 293, 294. We remanded "the entire case to allow the district court to determine what, if any, effect that material may have had on the conduct of the trial as a whole and its constituent counts." *Id.*

After the remand, the Assistant U.S. Attorney made further inquiries and learned that, on April 6, 1973, Diamond had been interviewed by DEA agent Claude Smith in Providence, Rhode Island, and that a tape recording had been made of a large part of the interview. The recording and a transcript of it (the Smith interview), 30 pages in length, were then filed in the record. Other agents testified that Diamond had been a government informant with respect to other matters in 1967. The trial judge held a lengthy evidentiary hearing that he found to be "exhaustive" and "exhausting," and considered the Benjamin report, the Smith interview, and a host of other material. He made detailed findings of fact.[4]

During the various interviews of Diamond, the government's principal interest, at least initially, was in determining whether government employees in the DEA, the Customs office, or other agencies were engaged in illicit drug transactions, or were cooperating with persons dealing in prohibited substances. Because the Beasley case originated with the tax investigation, Diamond did not initially furnish any information with respect to it, and his comments on

---

4. Unfortunately, the trial court failed to consider the rulings previously made with respect to the limitations on cross-examination. *Unit-* ed States v. Beasley, S.D.Ala.1977, Memorandum Opinion (Cr. No. 15, 933, Apr. 5, 1977).

Beasley were only peripheral to the government's primary purpose. However, there were various conflicts in the statements made by Diamond in his interviews. These are analyzed in detail in the appendix.

## II.

In *Jencks v. United States*, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, the Supreme Court held that the trial court erred in denying a defense request to have produced for inspection at trial and for use on cross-examination the prior statements of the government's two principal witnesses, who acknowledged that their prior statements were relevant to their testimony. In response, the Congress adopted Public Law 85–269, 18 U.S.C. § 3500, known as the Jencks Act. This familiar statute provides in part:

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

■ The Jencks Act applies only to federal litigation. It implements a Congressional purpose, not a constitutional mandate. It does not discriminate between statements that contain material beneficial to the defense and those that include other material. But the government's failure to comply with the Jencks Act does not per se require a new trial. In *Goldberg v. United States*, 1967, 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603, the court said that, if the error was harmless, a new trial would not be required. It elaborated what it meant:

> Since courts cannot "speculate whether [Jencks material] could have been utilized effectively" at trial, . . . the harmless-error doctrine must be strictly applied in Jencks Act cases.

425 U.S. at 111, note 21, 96 S.Ct. at 1348, 47 L.Ed.2d at 618 (citations omitted).

In setting forth the procedures to be followed on remand to the trial court, the Supreme Court in *Goldberg* cited Justice Brennan's dissent in *Rosenberg v. United States*, 1959, 360 U.S. 367, 373, 79 S.Ct. 1231, 1235, 3 L.Ed.2d 1304, 1308, in which the court upheld the defendant's conviction notwithstanding the non-disclosure of a witness' statement, because the information contained in the statement came out on cross-examination. Justice Brennan, who was joined in dissent by Justices Black and Douglas and Chief Justice Warren, said, in a statement apparently approved by a majority in *Goldberg*:

> Although we need not go so far as those courts which have suggested that the harmless error doctrine can never apply as to statements producible under the statute, . . . fidelity to the principle underlying Jencks and the Jencks statute requires, I think, that when the defense has been denied a statement producible under the statute, an appellate court should order a new trial unless the circumstances justify the conclusion that a finding that such a denial was harmful error would be clearly erroneous. In that determination, appellate courts should be hesitant to take it upon themselves to decide that the defense could not have effectively utilized a producible statement.

360 U.S. at 375–76, 79 S.Ct. at 1236, 3 L.Ed.2d at 1309–1310. The court in *Goldberg* also cited *Kotteakos v. United States*, 1946, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557, 1566–1567, in which the court then said:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress . . . . The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence [on the judgment].

*Goldberg* thus establishes a stricter standard than applies in constitutional cases regarding prosecutorial non-disclosure.

In *Brady v. Maryland*, 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, the Supreme Court decided that due process of law exacted of the States by the Fourteenth Amendment forbids the prosecution in a criminal case to suppress "evidence favorable to an accused upon request . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–1197, 10 L.Ed.2d at 218. *Brady* interpreted the constitutional guarantee of due process; therefore, it applies alike to federal and state prosecutions. While its command is broad, the decision is not all-embracing: *Brady* does not read the constitution to mandate showdown in criminal prosecutions; what it requires, in addition to the non-suppression of obviously exculpatory material, is ordinary compliance with defense requests for specific evidence that is material, or likely material, to issues of guilt or punishment.

With respect to federal trials, even when it is applicable, *Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation. *United States v. Agurs*, 1976, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399–2400, 49 L.Ed.2d 342, 352. It requires a retrial only if, after conviction of a defendant, it is learned that evidence requested and not produced creates a reasonable doubt that did not otherwise exist as to the guilt of the accused. In this respect, the criterion, as set forth in *United States v. Agurs, supra*, decided less than three months after *Goldberg*, is not whether the error is harmless in the usual sense. The court in *Agurs* said: "If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial." 427 U.S. at 113, 96 S.Ct. at 2402, 49 L.Ed. at 355. Thus, in *Agurs*, the court adopted a less demanding test in determining whether failure to produce *Brady* material would result in a new trial than the criterion employed in *Goldberg*.

This contrast in result may at first appear counter-intuitive: failure to comply with *Brady's* constitutional standard is not enforced by as stringent a test as failure to adhere to the statutory standard in the Jencks Act cases. But it must be remembered that *Brady* is a constitutional mandate. It exacts the minimum that the prosecutor, state or federal, must do. Moreover, it commands the disclosure of *exculpatory* evidence, a requirement that invites review of the record for materiality. While the Jencks Act is also designed to facilitate fair trials, it is a statutory command that may, at the will of Congress, exact more than the constitutional minimum, and its blanket disclosure requirement supports the conclusion that courts are not to review materiality, but only potential usefulness to the defense.

We draw these distinctions as to scope and time of impact because not all of the material now available is Jencks material, and some of the material required to be produced by *Jencks* would not be required to be produced by *Brady*. Decision of this case does not turn on reading the Jencks Act so literally as to be a per se rule that failure to produce a statement for any reason, however justified, requires a new trial absent certainty the error is harmless. For, as the appendix to this opinion and the analysis in Part III both show, the Smith statement was potentially highly useful to the defense; it would have been invaluable in cross-examination of Diamond, and it might have caused the jury to doubt his credibility. The conviction of Beasley on Count I truly turned on the testimony of Diamond, and, even if a balancing of values is involved with some account taken of the prosecution's good faith, that good faith here is not enough to outweigh the prejudice to the defendant.

### III.

### Confusion Worse Confounded[5]

Because the trial court found that the Assistant U.S. Attorney made a good faith

---

**5.** John Milton, Paradise Lost II, 996–997.

effort to comply both with the Jencks Act and his *Brady* duties, we must consider whether a failure to comply with the Jencks statute, in good faith, may be excused. In doing so, we are not unmindful the government has a vast number of agencies whose investigations may at times overlap, and that it is not always possible for any agency to know what all of its employees are doing, and frequently impossible initially for any one agency to know the activities of another.

Further, the trial judge's lament deserves emphasis: to require trial attorneys to ferret out and courts to review "all of the files of every conceivable government department that may have had any brush with the issues tried, as has been the case here" imposes a formidable task. Indeed, we repeat what has already been said. Here the Assistant U.S. Attorney initiated a search for other statements; he could find none. Later, the Solicitor General located the Benjamin statement through a New York office and thought the statement to be Jencks Act material; thoroughly analyzed, as it is in Part IV, it may not have been. Still later, the Assistant U.S. Attorney in Mobile located the Smith statement, now found to be Jencks material, by inquiring of a DEA office in Mobile, Alabama.

Yet, we daily impute to mammoth corporations knowledge of the activities of their myriad employees. *See, e. g., Steere Tank Lines, Inc. v. United States*, 5 Cir. 1963, 330 F.2d 719 (criminal liability). Where armies are deployed in a war on crime, they must maintain sufficient discipline to fulfill their statutory and constitutional duties. The

Jencks Act does not on its face restrict its command to the production of statements in the hands of, or known to, the particular prosecuting attorney assigned to the case, the U.S. Attorney's office, the Criminal Section of the Justice Department, or even the entire Justice Department. Its order is unqualified.

We put to one side cases dealing with lost material because the failure to produce what cannot be found does not patently violate the statutory mandate.[6] Those lost material cases on which the government here relies are inapposite with regard to our interpretation of the Jencks Act. For example, in *United States v. Augenblick*, 1969, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537, the issue was whether the non-disclosure in a court-material of lost tape recordings covered by the Jencks Act was such a violation of the defendants' *constitutional* rights as to oust the court-martial of jurisdiction "in the traditional sense," and thus to vest the Court of Claims with jurisdiction over the discharged servicemen's suit for backpay. The court observed that the "Jencks decision and the Jencks Act were not cast in constitutional terms,"[7] 393 U.S. at 356, 89 S.Ct. at 533, 21 L.Ed.2d at 545, and held that the *loss* of Jencks Act material did not violate due process absent evidence of intentional suppression. The court's holding was that the Court of Claims was thus barred from hearing the servicemen's suit.

■ Whether or not non-disclosure violates due process, however, a new trial may still be the appropriate sanction for statutory non-compliance. The Jencks Act's blan-

---

**6.** This case also involves a different balancing of policy considerations from decisions regarding those sanctions to be imposed where discoverable material is lost or destroyed. In such cases, a requirement of literal statutory compliance might simply bar prosecution. Such a drastic step must ordinarily be considered at the same time a court is "entirely in the dark," *United States v. Bryant*, 1971, 142 U.S.App.D.C. 132, 138, 439 F.2d 642, 648, with respect to the character of the evidence lost or destroyed. *Bryant*, in which the court remanded for a hearing on the circumstances surrounding the loss of evidence involved, dealt explicitly with standards applicable under F.R.

Cr.P., Rule 16, because the tapes involved included statements by the defendant and were requested prior to trial; however, the court treated the question of good faith under Rule 16 as being informed by the same considerations as are raised in the *Brady* or Jencks Act context.

**7.** One text accurately characterizes the holding in *Jencks* as based on the Supreme Court's "exercise of . . . supervisory power over federal practice," Kamisar, LaFave, and Israel, Modern Criminal Procedure 1235 note j (4th Ed. 1974).

ket disclosure requirement, as we have already noted, reaches more broadly than the constitutional standard applicable to evidence "material to exculpation or impeachment," *United States v. Hildebrand*, 5 Cir. 1975, 506 F.2d 406, 409, *cert. denied*, 1975, 421 U.S. 968, 95 S.Ct. 1961, 44 L.Ed.2d 457. Though the government may not be negligent here, the Jencks Act requires the adoption of prophylactic procedures to guarantee, to the fullest degree reasonably possible, comprehensive disclosure of material covered by that act. "The duty of disclosure affects not only the prosecutor, but the Government as a whole, including its investigative agencies," *United States v. Bryant*, 1971, 142 U.S.App.D.C. 132, 140, 439 F.2d 642, 650. *Cf., Giglio v. United States*, 1972, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104.

## IV.

### The Benjamin and Smith Reports

The Benjamin report consists of five typed pages. Benjamin was an inspector; his primary duty was internal security, that is, to determine whether or not government agents were engaged in improper activity. The focus and virtually the entire content of the report deal with questions about the activities of government employees. Only two paragraphs say anything at all about Mobile. While the rest of the report has properly been examined *in camera*, these paragraphs have been made available to the defendant. They are, therefore, reproduced in the footnote.[8]

The report is a narrative account. It does not purport to be verbatim or to transcribe Diamond's exact testimony. Benjamin and Weiser testified that the report was not adopted by Diamond; Diamond did not sign it. Although Diamond testified that he thought his responses to various questions were read back, both Benjamin and Weiser testified that this was not done. The trial judge made no finding with respect to whether the report was adopted by Diamond.

While it is doubtful that the Benjamin report was Jencks material, the government concedes that, had the Assistant U.S. Attorney known of its existence prior to the trial, he would have produced it. We will, therefore, assume *arguendo* that failure to produce it did violate the Jencks Act.

The Smith interview was, the court correctly found, covered by the statute. Both reports have, therefore, been examined under the strict harmless error standard of *Goldberg*.

Even under this scrupulous test, the failure to produce the Benjamin report was harmless. Diamond was cross-examined vigorously at the trial. There were no significant discrepancies between his lengthy, sometimes garrulous account there and Benjamin's synopsis of what Diamond had said about affairs in Mobile.

■ The Smith interview was different. Diamond's discussion of Mobile transactions was detailed and accounts for about six pages of the report. It conflicted in many significant ways with his testimony at the trial.

Not only was Diamond's evidence at the trial critical, its focal importance was recognized by all at the time. The prosecution and the defense argued his credibility to the jury at length. The prosecution sought to buttress credibility by almost tangential corroborative evidence: hotel bills showing

---

8. He [Diamond] stated that a Customs Agent named Roy MATTHEWS presently employed by Customs in Mobile, Alabama was closely associated and presently living with former New York Police Officer and BNDD defendant (case NY: S 11503) Samuel MORRIS. He said MORRIS and MATTHEWS were engaged in all sorts of smuggling including twenty to thirty kilos of heroin at a time. The point of entry into the United States would generally be Florida or New Orleans.

He also gave information in regard to alias DR. FINLEY, a pharmacist operating in Mobile, Alabama who was arrested with a stolen car. He identifies this pharmacist as a negro with light skin, approximately 39 years old. 2–IS–100 [Diamond] further stated that FINLEY is a major source of supply for large quantities of manite ranging up to 5,000 pounds.

the dates he was in Mobile and the testimony of room clerks that they recognized him. These served to give an air of plausibility to the rest of his account.

In significant and important respects, the Smith interview differs from Diamond's testimony at the trial. A comparison of some of these is set forth in an appendix to this opinion. While the cross-examination of Diamond was intensive, these apparent discrepancies would have furnished further ammunition for the defendant's attack:

> Every experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory. Flat contradiction between the witness' testimony and the version of the events given in his reports is not the only test of inconsistency. The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony.

*Jencks v. United States, supra,* 353 U.S. at 667, 77 S.Ct. at 1013, 1 L.Ed.2d at 1111.

Every member of this court has, at an earlier stage of his career, been faced in a courtroom with the problem of impeaching the key witness. None of us can say that, notwithstanding the fact that we could impeach Diamond for having been previously thrice convicted and a murderer and a narcotics dealer, we would not have welcomed the additional possibility of attacking his own detailed testimony with his contrary recorded words.

In view of the conclusion we have reached, we need not consider whether the limitation of the cross-examination of Diamond was erroneous. For the reasons we have given, we vacate the conviction of the defendant on Count I and remand the case for a new trial on that count.

## V.

The tax prosecution rested on different evidence. It was based on net worth, and a convincing case was established, most of it admitted by the defendant when he took the stand. The prosecuting attorney was frank to admit that the heroin charge was important in achieving the tax conviction because it enabled him to point to a source of unreported funds. To whatever degree Diamond was impeached concerning the alleged heroin conspiracy, there was convincing testimony by Mrs. Heron, unrebutted save by Beasley's personal denial, that Beasley was engaged in illicit activities potentially generating income. The record would support his conviction beyond reasonable doubt without a word from Diamond.

Therefore, we conclude that the failure to produce Jencks Act material was harmless beyond doubt as to Count Six, and we affirm the conviction of that charge.

AFFIRMED in part, REVERSED in part, and REMANDED.

### APPENDIX

| Coats Statement | Smith Interview | Trial |
|---|---|---|
| | . . . so I was there guess about, off and on for weeks, so I stop by his club, the SAFARI CLUB. . . . | Q: Who introduced you, if anyone, to Mr. Beasley? |
| | | A: . . . it was a little office on Davis Street or Davis Avenue, they call NOW; I don't know what it stands for. . . . And Barbara Heron introduced me to him. |
| | | * * * * * |
| | | Q: . . . how long was it after you hit town that |

| Coats Statement | Smith Interview | Trial |
|---|---|---|
| | | you went over and saw Mr. Beasley?<br><br>A: I'd say within the first day or day and a half when I got here . . . |
| He stated that the first deal [with Beasley] was in about the middle of 1970 . . . . | . . . I first met BEAS-LEY in October 1970. | Q: Did you ever have any any discussion with Mr. Beasley regarding heroin?<br><br>A: Yes, I did.<br><br>Q: Do you recall when they were?<br><br>A: October in seventy. |
| | . . . I had brought into the area about 25 ounces of drugs. . . . | Q: You had come down into Mobile and you hadn't brought the drugs with you?<br><br>A: No, sir.<br><br>Q: Who brought them?<br><br>A: Came in through a courier. |
| [During the first deal] he sold Bip an eighth of a kilo . . . . | . . . I think the first two things was two "pieces" (ounces) for $2,500 and I loan him a $1,000 cash.<br><br>SA SMITH: Was that in October 1970?<br><br>In October, 1970, the last part of 1970 or first part of 1971.<br>The next package was an eighth and ah, I told at the time instead of giving me $5,000, I want $4,500 . . .<br><br>\* \* \* \* \*<br><br>. . . so I gave him merchandise like, I would say on the ratio of an eighth of stuff every week, then he come up and, like, he was falling a $1,000 behind of $1,500, but you know like if you got your stuff hid in the bushes you don't care about a guy owing you money . . . | . . . I told him I start you off with a small package and let you build to a big package. I gave him an eighth of a kilo [for $3,-500 credit].<br><br>. . . I got my money on the first package in about four or five days. . . . I wouldn't say it was an hour (later) before I hit him with the second pack . . . . on or about the last of October, 1970, he paid me twenty four hundred dollars [for the first pack].<br><br>\* \* \* \* \*<br><br>A: After the second package, if I give it to him for thirty five, he only give me twenty four, he owe me eleven, and I give him another package on full consignment for thirty five again, so then apparently I hop to forty six. |

| Coats Statement | Smith Interview | Trial |
|---|---|---|
| | | Q: Now, how much was in that first package that you mentioned? |
| | | A: The first package was the eight and the second package was the eight. |

---

| Coats Statement | Smith Interview | Trial |
|---|---|---|
| Later on in 1970 he fronted a quarter of a kilo to "Bip." | . . . that was in, right around Christmas time of 1970, and he, for $15,000 and he gave me $7,500 up front. | Q: Now, was there a third package? |
| | | A: Yes, sir. |
| | | Q: How much was it? |
| | SA SMITH: Was that half a kilo of scag (heroin)? | A: Quarter. |
| | | *    *    *    *    * |
| | Yes, scag . . . | Q: Now, at the time you sold this one quarter to him, what was the status at that time between you and Mr. Beasley? |
| | | A: Paid up. |
| | | Q: . . . Now, when, if ever did you sell any more heroin to Mr. Beasley? |
| | | A: Another quarter. |
| | | *    *    *    *    * |
| | | I would say around November . . . . I mean December twenty third. |

---

| Coats Statement | Smith Interview | Trial |
|---|---|---|
| Still later in 1971 he fronted him another quarter. | Yes, 1971, and I went back in the area, and he gave me some of my money, and I gave him another ½ kilogram. | Q: When, if at any time, did you sell Mr. Beasley any more heroin after that last one quarter that you told us about? |
| | *    *    *    *    * | A: Seventy one. |
| | . . . that left him owing me $12,500. This was around May or June, somewhere around that time 1971. | *    *    *    *    * |
| | | A: June. |
| | | Q: And how much was it then? |
| | | A: A quarter. |
| | | Q: How much money was it for? |

| Coats Statement | Smith Interview | Trial |
|---|---|---|
| | | A: Seven thousand.<br><br>*    *    *    *    *<br><br>A: . . . All quarters are seven thousand.<br><br>*    *    *    *    *<br><br>Q: Now, after that, when is the next time that there was that you sold any heroin to Mr. Beasley?<br><br>A: Well, it was during the time I told you, around June or July [1971] that we closed our transaction out with the last two quarters, because he ended up owing me some money. . . . |

**WITH RESPECT TO ROY MATTHEWS (A Customs Agent)**

| Coats Statement | Smith Interview | Trial |
|---|---|---|
| Diamond further stated that he was paying $250.00 a week for protection. | "Roy shook me down, you know, for $500 once, cause he told me he knew what I'm doing, and another time for $250." | "He told me he could protect my operation if I would operate anywhere down the Gulf Coast and that for protecting my operation, he wanted two fifty a week . . . ."<br><br>*    *    *    *    *<br><br>"I came to an agreement to give him two fifty a week." |
| | In 1971, "I gave him a hundred dollars. So, that was the last money I remembered giving him." | Q. ". . . . how many times, if you can recall, did you make any payments of money?"<br><br>A. "I would say about 16 or 18 occasions . . . . [from] October, 1970 to January, 1971, June and July of 1971." |