**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Raquel N. MEDEL, and Rogelio M. Medel, Defendants-Appellants.**

**No. 77–5783.**

United States Court of Appeals,
Fifth Circuit.

April 12, 1979.

Rehearing and Rehearing En Banc Denied May 30, 1979.

Louis M. Jepeway, Jr., Miami, Fla., for defendants-appellants.

Jack V. Eskenazi, U.S. Atty., Marsha L. Lyons, Alan L. Weisberg, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, TUTTLE and HILL, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Appellants Rogelio and Raquel Medel, husband and wife, were convicted by a jury of willfully subscribing to false income tax returns for the years 1970 and 1971 (counts I and II of the four-count indictment) and of willfully attempting to evade income taxes due for the years 1972 and 1973 (counts III and IV). 26 U.S.C.A. §§ 7206(1), 7201. On appeal, the Medels raise a number of objections to the proceedings below. They claim that (1) they were deprived of their Sixth Amendment right to effective assistance of counsel because they were represented by one lawyer; (2) the District Court erred in allowing a government agent to testify regarding a statement made by the wife about her husband; (3) the trial

court improperly limited the Medels' questioning of certain witnesses; (4) their right to a fair trial was impinged due to prosecutorial misconduct; and (5) there was insufficient evidence to support their convictions. (6) Additionally, the Medels have renewed a motion to unseal the I.R.S. Special Agents' report, only parts of which were previously disclosed following a court order in response to *Jencks* and *Brady* demands. We have considered all of the points raised by the Medels and find no reversible error. We affirm.

## I. Facts

In 1969, Mr. Medel and David Egozi, M.D., formed a Florida corporation, the Doctor's Latin Center, Inc. The Doctor's Latin Center, a clinic, employed various physicians who treated clinic patients in return for a percentage of the medical fees generated. Other physicians rented office space at the Doctor's Latin Center and would reimburse it for the use of its services, such as x-ray or laboratory work.

Medel and Egozi were the sole shareholders of the corporation, each having a 50% ownership interest. Medel ran the clinic, with the assistance of Mrs. Medel, who processed insurance claims and handled the Center's billings. Dr. Egozi was not involved in the administration of the clinic.

The government contended that the Medels diverted to their own use funds that should have gone to the Doctor's Latin Center and thereby kept these funds from being reported on the income tax returns of either the Medels or the clinic. To prove its case, the government employed the "specific items" method to trace specific income items that should have gone to the clinic but were instead received by the Medels and unreported on their federal income tax returns.[1]

The defendants claim that they had not intentionally signed false tax returns or evaded their tax obligations. Instead, they argued that they had always acted in good faith, relying on their accountant who had prepared their tax returns. The defendants also attempted to show that the unreported income items were either offset by unreported capital and business losses or were not income at all but merely loan repayments.

The jury did not credit the Medels' story, finding them guilty on all four counts. Mr. Medel was sentenced to serve four concurrent three-month sentences and pay a fine of $2,000 for each violation. Mrs. Medel was fined $500 on each count.

## II. Conflict Of Interest

At trial, and indeed on this appeal, the Medels were represented by a single attorney. The Medels now claim that the joint representation at trial was unconstitutional in light of the conflicting interests of the two defendants.

■ The defendants are quite correct in pointing out that where codefendants' interests are in conflict, the joint representation of codefendants by a single attorney may deprive a codefendant of his Sixth Amendment right to effective assistance of counsel. *See e. g., Glasser v. United States,* 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (constitutional violation for Court to order attorney to represent codefendants whose interests are in conflict); *White v. United States,* 5 Cir., 1968, 396 F.2d 822 (constitutional violation for attorney to represent one codefendant who seeks to absolve himself by implicating second codefendant).

---

1. Viewed in the light most favorable to the government, *Glasser v. United States,* 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, the evidence shows that the Medels diverted clinic funds to their own use in several ways. For example, when physicians sought to reimburse the clinic for the use of its services, Mr. Medel would occasionally direct them to make their checks payable to himself or to leave the payee blank. Mr. Medel would also direct clinic patients to endorse their insurance settlement checks over to him. These checks were then either cashed by the Medels or deposited in their bank accounts. The proceeds of other checks payable to Doctor's Latin Center or to its physicians were also diverted by the Medels.

Indeed, very recently, both the Supreme Court and this Court have had occasion to emphasize the commitment to the principle of conflict-free representation. In *Holloway v. Arkansas,* 1978, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426, the Supreme Court held that where defense counsel had notified the trial court of a possible conflict, the trial court's failure either to appoint separate counsel or to inquire into the need for separate counsel required an "automatic" reversal of the convictions of three codefendants who had been represented by a single court-appointed attorney. More recently, in *United States v. Alvarez,* 5 Cir., 1978, 580 F.2d 1251, this Court held that the joint representation by retained counsel of a defendant who had pleaded not guilty and two codefendants who had pleaded guilty and testified for the government at defendant's trial created an impermissible conflict of interest. In reversing the defendant's conviction, the Court stated this Circuit's rule for conflict of interest cases: "We hold today that an accused, whether represented by appointed or retained counsel, is deprived of his Fifth and Sixth Amendment right to effective assistance of counsel, even in the absence of a showing of prejudice, when his attorney operates under an actual conflict of interest." *Id.* at 1260.

Of course, in each of these cases, the crucial underpinning to the finding of a constitutional violation was the finding of an actual conflict of interest. Thus, in *Alvarez,* we emphasized that "an actual conflict of interest must always be demonstrated before an accused can establish a denial of effective assistance of counsel . . ." *Id.* See also *United States v. Fannon,* 5 Cir., 1974, 491 F.2d 129, 132, *cert. denied,* 419 U.S. 1012, 95 S.Ct. 332, 42 L.Ed.2d 286. In other words, there must be some divergence in the parties' interests. *Burston v. Caldwell,* 5 Cir., 1975, 506 F.2d 24, 30, *cert. denied,* 421 U.S. 990, 95 S.Ct. 1995, 44 L.Ed.2d 480.

The mere fact of joint representation will certainly not show an actual conflict: "Re-quiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not per se violative of constitutional guarantees of effective assistance of counsel." *Holloway v. Arkansas,* 435 U. S. at 482, 98 S.Ct. at 1178. *See also Foxworth v. Wainwright,* 5 Cir., 1975, 516 F.2d 1072, 1076 ("Joint representation by appointed counsel does not inherently deprive a defendant of the effective assistance of counsel."); *United States v. Fannon,* 491 F.2d at 132 ("[A] conflict will not be inferred from the mere fact of joint representation."). Nor can a conflict be established through hypothesis or speculation. *United States v. Alvarez,* 580 F.2d at 1260. *Accord, United States v. Williams,* 8 Cir., 1970, 429 F.2d 158, *cert. denied,* 400 U.S. 947, 91 S.Ct. 255, 27 L.Ed.2d 253.

Additionally, where codefendants' statements are largely corroborative, repetitive, or serve the same purpose, there is no conflict. For example, in *Burston v. Caldwell, supra,* Burston challenged his robbery conviction on the grounds that there was a conflict in the interests of himself and a codefendant, Askew. Basically, Askew's testimony was that Burston only assaulted and did not rob the victim and that she, Askew, had had nothing to do with the assault. Burston contended that Askew's statement, implicating him and exculpating herself, revealed a conflict of interest. This Court found that this testimony would not support a finding of a "divergence of interest" between the two codefendants:

[B]oth defendants exonerated Askew and both were concerned with proving that no money had been taken from the victim. Askew's testimony, exonerating petitioner of a capital offense, was crucial even though it implicated him in a misdemeanor charge. In these circumstances, petitioner has failed to establish that any conflict of interest existed . . . .

506 F.2d at 31.

Similarly, in *United States v. Fannon, supra,* Reimbold, a codefendant, pleaded

guilty and testified against Fannon, describing the occurrences that culminated in the codefendants' arrests. Subsequently, Fannon testified, admitting that the activities described by Reimbold had occurred but seeking to excuse his participation on the grounds that he was coerced by others. On appeal, Fannon contended that because of the conflicting interests of Fannon and Reimbold, their attorney had failed adequately to cross examine Reimbold, with the result that Fannon was deprived of his Sixth Amendment rights. This Court, however, disagreed and held that there was no conflict:

> It is . . . clear that appellant [Fannon] has not demonstrated any actual conflict of interest. For once appellant took the stand and admitted the substance of Reimbold's testimony, defense counsel could gain nothing from impeaching Reimbold. Fannon has not alleged that he would not have testified had his attorney attempted to impeach Reimbold. Indeed, in his brief, appellant adheres to his defense of coercion.

491 F.2d at 132.

On the other hand, a conflict will be found when the testimony of one codefendant inculpates another, *White v. United States,* 396 F.2d at 823–24, or when procedures or tactics are pursued that benefit one codefendant while harming another. *Holland v. Henderson,* 5 Cir., 1972, 460 F.2d 978; *Baker v. Wainwright,* 5 Cir., 1970, 422 F.2d 145, *cert. denied,* 399 U.S. 927, 90 S.Ct. 2243, 26 L.Ed.2d 794. We have also held that a conflict of interest exists "whenever one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a codefendant whom counsel is also representing." *Foxworth v. Wainwright,* 516 F.2d at 1076.[2]

■ In the case before us, to demonstrate the alleged conflict, the Medels point

to a single incident at trial where an I.R.S. agent repeated certain remarks made by Mrs. Medel after her husband had admitted to lying to I.R.S. investigators about an alleged loan from a Dr. Mada. The testimony was elicited during the following exchange:

A: [A]t first, Mr. Medel said that all the statements that he had made were truthful. And then after some exchange with his attorney, he said that the only statement that he had made that was not totally truthful was the one about Mada. He went on to—I asked him why he had made the statement concerning Dr. Mada. And he made several comments about the reason, the first of which was that he said he was afraid. And second, he said that he had never dreamed that he would have any problem with the Internal Revenue Service, and he wasn't sure that everything was quite right or in balance about his tax returns.

Finally he stated that he had made the statement about the $30,000.00 loan because he did not want to have any any [*sic*] problems with, what he stated was the tax man.

Q: Did Mr. Medel indicate to you whether or not he had spoken to Dr. Mada about this alleged $30,000.00 loan?

A: Yes. He stated that he had talked to Dr. Mada and that he had asked Dr. Mada about what his condition or financial condition had been in 1971 and that he asked if Dr. Mada would tell the agents that he had received a loan.

Q: Did Mrs. Medel make any comments concerning the loan during this interview?

A: Yes, she did.

Q: What did she say?

A: Mrs. Medel stated that her husband had made the comments about re-

---

2. When the Court spoke of "damage" here, it is obvious that it was not referring to the prejudice/harmless error standard that was rejected in *Holloway* and *Alvarez.* That standard was, of course, relevant only *after* a conflict had

been found. In *Foxworth,* it is clear that the Court was instead referring to the sort of adversity of interest that turns a mere joint representation into a conflict of interest situation.

ceiving a $30,000.00 loan from Dr. Mada because he wasn't quite sure that everything was in balance about his tax situation or their tax situation.

1st Supp. Record, vol. I, at 299–300.

The Medels contend that this statement demonstrates a conflict of interest between Mr. and Mrs. Medel because the statement inculpated Mr. Medel in the crimes charged and exculpated Mrs. Medel. Accordingly, the Medels argue, Mr. Medel was denied effective assistance of counsel because the attorney, out of his conflicting obligation to exonerate Mrs. Medel, failed to object to this damaging evidence.

We find nothing in this incident to show a conflict of interest. In the first place, we fail to see how the remarks attributed to Mrs. Medel indicate that the Medels' interests are divergent. The remarks merely reiterate a statement already attributed to Mr. Medel and twice admitted by him (both during the I.R.S. investigation and at trial).[3] As in *Fannon*, this admission that repeats the allegedly conflicting testimony destroyed whatever conflict might have existed.

Nor does this evidence exculpate Mrs. Medel. At most, the testimony is, as the trial court told the jury, irrelevant to the case against Mrs. Medel, a case that was proved through other evidence relating to her own activities. See page 1315, *infra*.

As we stated above, the mere fact of joint representation does not establish a conflict of interest, and we find nothing else in this case that would indicate any impropriety in the joint representation of Mr. and Mrs. Medel. Defendants have not suggested any plausible alternative strategy that was unavailable due to the joint representation. *Cf. Government of Canal Zone v. Hodges*, 5 Cir., 1979, 589 F.2d 207 at 209. Indeed, under the circumstances presented here, the united front strategy

appears quite a reasonable one. Both parties had signed the income tax returns. Both parties had been heavily involved in running the Doctor's Latin Center. Both parties needed to show that they had acted in good faith. When the parties' interests were so closely related, if either had suggested that the other party was guilty, then this allegation might have worked to the detriment of the accusing party. Thus, the situation here is very much like that suggested in *Holloway* as an appropriate case for joint representation:

> [I]n some cases multiple defendants can appropriately be represented by one attorney; indeed, in some cases, certain advantages might accrue from joint representation. In Mr. Justice Frankfurter's view: "Joint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack."

*Holloway v. Arkansas*, 435 U.S. at 482, 98 S.Ct. at 1178, quoting *Glasser v. United States*, 315 U.S. at 92, 62 S.Ct. 457 (Frankfurter, J., dissenting).

■ We conclude that the statement adduced as evidence of a conflict and the proceedings as a whole fail to indicate a conflict of interest between Mr. and Mrs. Medel. The Medels' interests are closely aligned such that their united front strategy might well have been the best strategy available. Additionally, we find no indication that the interests of one codefendant were likely sacrificed to promote the interests of the other. Therefore we hold that there was no conflict of interest in the joint representation of Mr. and Mrs. Medel. Consequently, the Medels' Sixth Amendment rights were not infringed.

■ We also reject the Medels' contention that the trial court was under an affirmative duty to inquire into the possibility of a conflict of interest. Defense counsel,

3. There is no indication that Mr. Medel would not have made these statements had his wife's remarks not been admitted.

who had worked on the Medels' case since May 1974, never indicated to the trial court that a conflict might exist. Nor do we find anything in the record that should have alerted the Court to such a possibility.[4] The mere fact that the codefendants were tried together does not trigger a duty of inquiry on the part of the trial court.[5] At any rate, the question of the Court's duty to make inquiry is largely irrelevant since we find no conflict to begin with.

### III.  Husband/Wife Privilege

■ As a separate issue, the Medels argue that the same testimony that showed the so-called conflict of interest, i. e., Mrs. Medel's statement to the I.R.S. agent, was erroneously admitted in violation of the common law rule that the testimony of one spouse is inadmissible against the other. *See, e. g., Hawkins v. United States*, 1958, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125; *Ivey v. United States*, 5 Cir., 1965, 344 F.2d

4. The motion to sever, on the part of Mrs. Medel, would not provide the requisite notice. A motion for separate counsel and a motion for severance are entirely different matters and address altogether different concerns. That separate counsel might be appropriate in a given instance does not mean that severance would also be appropriate, and *vice versa. Cf. Baker v. Wainwright*, 422 F.2d at 149 (although joint representation at single trial was impermissible, the Court recognized the possibility of separate trials with representation by the same counsel). Thus, the fact that a motion to sever was made—incidentally, claiming prejudice to the opposite party allegedly prejudiced here—provided little warning, if any, of the possibility of a conflict of interest.

5. The Medels point to *Holloway* as requiring the trial court to ascertain whether a conflict of interest exists. In *Holloway*, however, the Court was dealing with a situation in which trial counsel had repeatedly told the Court about the possibility of a conflict of interest. The Court expressly left open the question of the trial court's affirmative duty to assure conflict-free counsel where, as here, the issue was not otherwise brought to the trial court's attention. See *Holloway v. Arkansas*, 435 U.S. at 483–484, 98 S.Ct. 1173. Similarly, in *Alvarez*, this Court observed that the trial court had had actual notice of the conflict. See *United States v. Alvarez*, 580 F.2d at 1260.

The Medels also cite the American Bar Association's Standards Relating to the Administra-

770. This may well be the law. Nevertheless, there was no reversible error here. In the first place, the Medels failed to object to the statement. See F.R.Evid. 103(a). Moreover, in light of the Agent's testimony to the same effect, and especially in light of Mr. Medel's twice-repeated admission that he made these remarks, the error, if any, in admitting the statement attributed to Mrs. Medel was harmless.

### IV.  Evidentiary Rulings

The Medels also allege as error certain evidentiary rulings made by the trial court. First, they contend that the Court erred in striking two witnesses' testimony regarding loan repayments paid by check to Mr. Medel.[6] The trial court excluded this evidence on the grounds that payments made by check were irrelevant to defendants' attempt to show that there was "money flying all over the place."[7] The Medels now claim that this limitation destroyed their

tion of Criminal Justice: The Function of the Trial Judge § 3.4(b) as support for the proposition that judicial inquiry into the possibility of a conflict is mandated. We must disagree with this construction of the ABA standard. Pointing to the "should" language of the provision in question, we observe that the standards are not commands but rather goals.

6. Apparently to show that the Medels had received cash that was not income (1st Supp.R., vol. II, at 441), the defense presented witnesses who testified that Mr. Medel had loaned them money that they had repaid, either by check or cash or a combination of the two, during the tax years in question. *Id.* at 428–40. Upon similar testimony from additional witnesses, the Court struck this testimony regarding repayments made by check. *Id.* at 460–61, 464–66. Subsequently, other witnesses then testified that they had repaid loans at least in part by cash. *Id.* at 471–79.

7. THE COURT: What's the purpose of these witnesses? They are showing that the defendants made loans?
    MR. BRENNAN: Yes, sir.
    THE COURT: And they didn't get repaid?
    MR. BRENNAN: Paid back $5,000 and $850 and the money went back into—
    THE COURT: You're trying to show that the money went back into the account?
    MR. BRENNAN: To show that there is money flying all over the place  .  .  . ..

defense of reliance on their accountant and also precluded their showing that the large deposits in their bank account and the funds used to purchase certain cashier's checks came not from diverted funds but from money received as loan repayments.

■ As a general rule, a trial court's rulings on relevance and admissibility of evidence will not be disturbed absent a showing of abuse of discretion. *United States v. Linetsky*, 5 Cir., 1976, 533 F.2d 192, 204. Applying that principle here, we cannot say that the trial court improperly restricted the defendants' examination of its witnesses. Indeed, if anything, the trial court was quite generous in allowing the testimony of several witnesses where, as we see it, the subject of their testimony appears irrelevant to the government's "specific item" method of proof.[8]

■ The Medels also claim that the Court improperly restricted their cross-examination of their accountant Felix Cedeno, who testified as a government witness. During cross-examination, defense counsel asked Mr. Cedeno where the money "siphoned off by the Medels" should have been reported. At this time, there had been no evidence that any money had been "siphoned off by the Medels." Mr. Cedeno did not understand the question, and when counsel restated the question, the following exchange ensued:

Q This one bank account, this one that had $150,000.00 deposited in it in one year, some of that money came from an insurance company or clients?

MRS. LYONS: Your Honor, I am going to have to object. There has been no

\* \* \* \* \* \*

THE COURT: Ladies and gentlemen of the jury, insofar as the testimony of this witness related to a loan that was repaid by a check, the Court is going to grant the motion to strike by the Government since it is irrelevant to the issues in this case; . . . Mr. Brennan, I'm going to refuse admission of this exhibit since again it is a check and repayment was by check and therefore it would be irrelevant. It wasn't repaid in cash in the testimony.

evidence of any of this presented to this witness.

THE COURT: That is correct.

You are referring to Mrs. Lyons' opening statement, Mr. Brennan. And the witness did not have the benefit of hearing it.

MR. BRENNAN: Thank you, Your Honor. No further questions.

1st Supp. Record, vol. I, at 99–100. Thereafter, defense counsel presented no further questions to Cedeno on this subject. Nor did he tender for the Court's consideration any line of questioning or arguments that would show the relevancy of this questioning. Under these circumstances, we find no error in the trial court's sustaining the government's objection to defense counsel's questions. See F.R.Evid. 103(a)(2).

## V. Improper Prosecutorial Remark

During closing argument, and without objection from the defense, government counsel made the following statement:

As I have told you, the Government in this case and in every case must prove the offense beyond a reasonable doubt and I believe that if you go over this evidence very carefully and considered where it has come from, that is, those people who have had no reason to come in here and lie or to change their testimony in any way, people who simply had business dealings with Doctors Latin Center and who paid them money and if you analyze what was said, You will have to find that the Medels took the money that belonged to the clinic, made it income to them, taxable income to them, and yet never

MR. BRENNAN: Yes, Your Honor.
*Id.* at 441, 460–61.

8. Under the "specific item" method of proof, the government took *specific* checks paid by physicians, lawyers, patients, and insurance companies and traced them to the defendants. These specific items were used to prove that the Medels had unreported income. Regardless of any loan repayments, these specific items remained unreported income.

reported it in any one of these years in question, and that this has been proved beyond a reasonable doubt.

2d Supp. Record, at 72–73.

■■■ The defense claims that this is an improper assertion of the prosecutor's personal belief in the defendants' guilt. Government counsel did not, however, state that she believed that the defendants were guilty. She stated that she believed that a careful appraisal of the evidence should result in the jury's finding the defendants guilty. In effect, then, counsel based her belief upon the evidence introduced at trial. Under such circumstances, there is no plain error. *United States v. Juarez,* 5 Cir., 1978, 566 F.2d 511; *United States v. Dawson,* 5 Cir., 1973, 486 F.2d 1326.

### VI. Sufficiency Of The Evidence

■■■ The defendants challenge the sufficiency of the evidence against them. Viewing the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. at 80, 62 S.Ct. 457, we hold that there was sufficient evidence from which the jury could find defendants guilty beyond a reasonable doubt.

There is considerable evidence to support the jury's finding that Mr. Medel had willfully subscribed to a false tax return and had willfully attempted to evade income taxes. Mr. Medel ran the Doctor's Latin Center and was actively involved in its business arrangements. The government showed that on several specific occasions funds that should have gone into the Doctor's Latin Center account were either deposited in the Medels' account or cashed by Mr. Medel. There is also evidence to show that Mr. Medel told persons owing money for clinic services to make their checks pay-

able to him or to leave the payee blank. *See* note 1, *supra.* Mr. Medel was also shown to have lied to I.R.S. agents regarding the Medels' financial dealings. Moreover, despite Mr. Medel's attempt to portray himself as an unsophisticated businessman, the evidence shows that Mr. Medel was involved in a variety of business ventures. From such evidence, the jury could properly convict Mr. Medel of the crimes charged.

There is also sufficient evidence to support the verdicts against Mrs. Medel. Mrs. Medel, as well as Mr. Medel, had signed the income tax returns. Mrs. Medel was well-acquainted with the business operations of the Doctor's Latin Center. She was characterized as its "chief business officer." She received and processed insurance drafts as they came in and was in charge of the clinic's billings. Her husband was extremely dependent upon her. There was evidence that she attempted to conceal unreported income by having relatives purchase cashier's checks with cash that she had furnished. Based upon all this evidence, we cannot say that the jury *must necessarily* have entertained a reasonable doubt about Mrs. Medel's guilt. *United States v. Haggins,* 5 Cir., 1977, 545 F.2d 1009.

### VII. The Special Agents' Report

With this appeal, the Medels have also renewed a motion to unseal an exhibit, the I.R.S. Special Agents' report.[9] At trial, the defendants moved that the report be produced for their inspection. Following an *in camera* review of the report, the District Court concluded that only portions of the report were discoverable. Accordingly, the District Court ordered those parts disclosed and sealed the report as an exhibit of the Court. The Medels now contend that the

---

**9.** This is the third such motion on appeal. The first, made prior to oral argument, was denied so as to leave resolution of the issue with the Panel hearing the case. The second motion

was denied because the defendants had not indicated which portions of the report had been disclosed pursuant to the District Court's order.

entire report should have been produced, as Jencks Act [10] or *Brady* [11] material.

## A. *Jencks Act Material*

We have carefully reviewed the Special Agents' report and conclude that the District Court did not err in failing to order the entire report produced as discoverable Jencks material. Much of the material in the report consists of summaries of memoranda of interviews. Whether a government agent's summary of a government witness's remarks is proper Jencks material depends upon the extent to which that summary is a verbatim recitation, adopted by the witness, of the witness's remarks. *United States v. Judon,* 5 Cir., 1978, 581 F.2d 553 [*Judon II*]; *United States v. Judon,* 5 Cir., 1978, 567 F.2d 1289 [*Judon I*]; *United States v. Hodges,* 5 Cir., 1977, 556 F.2d 366, *cert. denied,* 1978, 434 U.S. 1016, 98 S.Ct. 735, 54 L.Ed.2d 762. Such a question is a matter of fact to be decided by the trial court, and, like all ques-

tions regarding discovery under the Jencks Act, the trial court's determination will not be overturned unless it is clearly erroneous. *Judon II,* 581 F.2d at 554; *United States v. Hodges,* 556 F.2d at 368. Here, our review of the relevant material convinces us that the Court's decision not to disclose these summaries of summaries was correct because none of the report contains substantially verbatim remarks of witnesses. [12] There is also no indication that the material in the report was adopted by the witnesses.

The lengthiest part of the report is an examination, from a federal income tax standpoint, of the Medels' various income sources, both taxable and nontaxable. This part of the report might be construed as a "statement" of the two agents who testified at trial. If so, this part was producable if it related to the subject matter of the agents' testimony. We need not, however, decide this question, for we have frequently found that there is no Jencks violation where the Court fails to require

10. The Jencks Act, 18 U.S.C.A. § 3500, provides, in pertinent part:

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

\* \* \* \* \* \*

(e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement.

11. *Brady v. Maryland,* 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. The defendants also allege that there was material that should have been produced under *Mesarosh v. United States,* 1956, 352 U.S. 1, 77 S.Ct. 8, 1 L.Ed.2d 1, or possibly *Giglio v. United States,* 1972, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104. Having examined the report in detail, we find nothing that even remotely appears to be *Mesarosh* or *Giglio* material. Therefore, we will limit our discussion to the question whether there was improperly withheld Jencks or *Brady* material.

12. The above discussion pertains to that material that was derived from interviews with government witnesses. The agents' report also contained information derived from interviews with persons who did not testify for the government and with the Medels. Information from the former source is not Jencks material. As for the information derived from the Medels, the material in the agents' report is but a synopsis of material in the memoranda of interviews with the Medels. Because the government produced these memoranda, its obligation to produce the Medels' statements has been met.

the production of material that is merely duplicative of material already in the defendant's possession. *United States v. Rivero,* 5 Cir., 1977, 554 F.2d 213; *United States v. Valdes,* 5 Cir., 1977, 545 F.2d 957; *United States v. Crumpler,* 5 Cir., 1976, 536 F.2d 1063, *cert. denied,* 1977, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750.

Here, the information regarding the Medels' tax situation is, for the most part, merely a summary of information contained in exhibits, substantially all of which were previously provided the Medels. See R., vol. I, at 22–30 (Government's Discovery Certificate listing 137 items). Moreover, most of the material deals with matters, such as computing the Medels' income on the "net worth" method, that were not at issue at trial. That part of this material that was relevant to issues at trial, such as information dealing with the Medels' capital transactions, was disclosed to the Medels. We cannot say that the failure to disclose the rest of this material was clearly erroneous.

We similarly find no clear error in the Court's application of the Jencks Act to that part of the report dealing with the agents' analysis of the government's case against the Medels. Here, the Court did order produced that portion of the report dealing with the defenses raised by the Medels. The Court did not order disclosed that portion dealing with the agents' suggestions for rebutting the Medels' defenses and their discussion of the evidence of the Medels' criminal intent. At trial, the government agents testified about the tax implications of the Medels' actions. The agents' remarks regarding the strength of the case against the Medels do not appear particularly relevant to their testimony. Hence, the District Court's decision to exclude these remarks from discovery was not clearly erroneous.

### B. Brady Material

In *Brady v. Maryland,* 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is *material* either to guilt or punishment . . . ." *Id.* at 87, 83 S.Ct. at 1196–7 (emphasis added). In this Circuit, we apply a strict standard of materiality. *Judon I,* 567 F.2d at 1293; *Calley v. Callaway,* 5 Cir., 1975, 519 F.2d 184, *cert. denied,* 1976, 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760. *See also United States v. Beasley,* 5 Cir., 1978, 576 F.2d 626 (comparing remedies for Jencks Act and *Brady* violations). In particular, we will be careful in our review where the District Court has itself conducted an *in camera* inspection of the alleged *Brady* material. *See United States v. Buckley,* 5 Cir., 1978, 586 F.2d 498; *United States v. Ross,* 5 Cir., 1975, 511 F.2d 757, *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54; *United States v. Register,* 5 Cir., 1974, 496 F.2d 1072, *cert. denied,* 1975, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 819. Bearing these principles in mind, we have examined the Special Agents' report in its entirety. We did not find any undisclosed evidence that was materially favorable to the Medels—whether as to guilt, punishment, or both. Therefore, the District Court did not violate the *Brady* rule.

We conclude that there was no improper withholding of either *Brady* or Jencks material. If by chance, however, there were any error, it would be harmless. *United States v. Agurs,* 1976, 427 U.S. 97, 111–12, 96 S.Ct. 2392, 2401–2402, 49 L.Ed.2d 342, 354. (*Brady* harmless error standard); *Goldberg v. United States,* 1976, 425 U.S. 94, 111 n. 21, 96 S.Ct. 1338, 1348, 47 L.Ed.2d 603, 618. (Jencks Act harmless error standard). *See also United States v. Beasley,* 576 F.2d at 629–30.

The convictions of defendants are

AFFIRMED.