******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

ECKER, J., dissenting. In the middle of the defendant's trial for the crimes of sexual assault in the third and fourth degrees and risk of injury to a child, it came to light that the complainant maintained handwritten journals, which she testified on cross-examination were "the best record" of the sexual abuse committed by the defendant, Andres C. The trial court ordered the state to take possession of the journals, which are written in Spanish and total 333 pages,[1] and to review them for "statements" concerning the crimes charged and "any exculpatory material." The prosecutors assigned to the case could not read Spanish. Rather than have the journals translated into English, they delegated their duty of review to a bilingual layperson, an investigator employed by the state's attorney's office. The investigator reported to the prosecutors that no disclosable material existed, and, as a result, the defendant was denied access to the journals. To this day, no lawyer, judge, or trained legal professional has reviewed more than four pages of the complainant's journals to determine whether they contain discoverable statements under our rules of practice or material, favorable information required to be disclosed to the defense under *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

The central purpose of a criminal trial is "to ascertain the truth which is the sine qua non of a fair trial." *Estes* v. *Texas*, 381 U.S. 532, 540, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965). In the present case, it is clear to me that a review of an English translation of the complainant's journals for *Brady* material by a trained legal professional familiar with the facts of the case is essential

---

[1] The journals were marked as an exhibit for identification at trial and placed under seal. In response to the trial court's inquiry regarding length, the prosecutor estimated that the journals were approximately 200 pages long. In fact, they contain 333 pages of entries.

to fulfill the truth seeking function of the defendant's criminal trial. I find it unacceptable that these journals have been and remain unknown and unknowable to anyone with responsibility for ensuring that justice is done. Given the complainant's testimony that the journals describe the crimes committed by the defendant and constitute "the best record" of the underlying events, and in light of the crucial importance of the complainant's credibility to the outcome of the defendant's trial, I cannot join the majority opinion affirming the defendant's conviction because no member of the legal profession—not the prosecutors, defense counsel, the trial court, the Appellate Court, or any member of this court—has reviewed these journals to determine whether they contain discoverable statements or *Brady* material.

The certified issues in the present appeal[2] cannot be decided until a proper review of the journals is conducted at the trial court level by a person equipped with the factual and legal knowledge essential to perform that review and to make the necessary judgments regarding disclosure required under our rules of practice and *Brady*. I therefore respectfully dissent. I would retain jurisdiction over the present appeal and remand this case to the Appellate Court with direction to remand it to the trial court and to have that court order the journals translated into English and conduct further proceedings to determine whether the journals, or any portion thereof, contain information subject to disclo-

---

[2] This court certified the following two issues for appellate review: (1) "Did the Appellate Court incorrectly conclude that the defendant had waived his claim that he was entitled to disclosure of the contents of the complainant's journals as the discoverable statements of a witness?" And (2) "[d]id the Appellate Court incorrectly conclude that the *Brady* review . . . of the complainant's journals by a nonlawyer member of the state's attorney's office was constitutionally adequate?" (Citation omitted.) *State* v. *Andres C.*, 342 Conn. 901, 270 A.3d 97 (2022).

sure under Practice Book §§ 40-13A and 40-15 (1),[3] or *Brady.*[4]

I

The majority concludes that the complainant's Spanish language journals were not subject to discovery under Practice Book §§ 40-13A and 40-15 (1) because the complainant did not adopt or approve them as her "statement." See part I B of the majority opinion. The majority's conclusion is inconsistent with the well established principle that a witness' intent to adopt or approve a statement within the meaning of our rules of practice is a factual question, which, in the absence of subsidiary factual findings by the trial court, cannot be decided by this court on appeal. Remand to the trial court is necessary so that an evidentiary hearing can be conducted to resolve the factual question as to whether the complainant's journals were "adopted or approved" within the meaning of §§ 40-13A and 40-15 (1).

At the outset, I offer two nontrivial observations regarding procedural matters relating to this aspect of

---

[3] Practice Book § 40-13A provides: "Upon written request by a defendant and without requiring any order of the judicial authority, the prosecuting authority shall, no later than forty-five days from receiving the request, provide photocopies of all statements, law enforcement reports and affidavits within the possession of the prosecuting authority and his or her agents, including state and local law enforcement officers, which statements, reports and affidavits were prepared concerning the offense charged, subject to the provisions of Sections 40-10 and 40-40 et seq."

I agree with the majority that the definition of the term "statement" in Practice Book § 40-15 (1) "extend[s] to that term as used in [Practice Book] § 40-13A." Part I B of the majority opinion. Pursuant to Practice Book § 40-15 (1), the term "statement" means "[a] written statement made by a person and signed *or otherwise adopted or approved by such person* . . . ." (Emphasis added.)

[4] Although the issue is not before us in the present appeal, I agree with Justice McDonald's observations in his concurring opinion that the complainant's journals also "were most likely discoverable pursuant Practice Book § 40-11" and that "nothing in the majority opinion should be read to preclude such a disclosure under that provision."

the appeal. First, the Appellate Court never addressed the defendant's claim that he was entitled to disclosure of the journals under Practice Book §§ 40-13A and 40-15 (1) because it determined that he had waived this claim in the trial court. See *State* v. *Andres C.*, 208 Conn. App. 825, 853, 266 A.3d 888 (2021) ("[d]efense counsel agreed to the procedure to be used in the review of, and potential disclosure of, the contents of the journals"). Rather than addressing the issue decided by the Appellate Court and certified by this court on appeal, the majority rests its holding on altogether different grounds, namely, that the statements contained in the journals were not adopted or approved by their author, the complaining witness.[5]

---

[5] The Appellate Court incorrectly concluded that the defendant had waived his claim that he was entitled to the complainant's journals as the discoverable statements of a witness. Promptly upon learning that the journals existed, defense counsel explicitly requested disclosure of them "as discovery," and, following an off-the-record discussion in chambers between the trial court, the prosecutors, and defense counsel, the trial court ordered the state to take possession of the journals and "to determine, what, if anything in those journals . . . *comprise statements by [the complainant] concerning the incidents in question*" and to "disclose to defense counsel any such material, *specifically, statements made by [the complainant] in her journals concerning the sexual assault allegations* . . . ." (Emphasis added.) The trial court refined this order the next day as it related to *Brady* material, but it never expressly modified the order with respect to the production of statements subject to disclosure under the rules of practice. Although defense counsel's request did not refer specifically to Practice Book § 40-13A, the terminology used by defense counsel and the trial court reflects their understanding that all "statements . . . prepared concerning the offense charged" would be disclosed to the defense consistent with this rule of practice. Practice Book § 40-13A; see, e.g., *State* v. *Santana*, 313 Conn. 461, 468, 97 A.3d 963 (2014) (claim is not unpreserved simply because defendant did "not use the term of art applicable to the claim, or cite to a particular statutory provision or rule of practice," if defendant "argued the underlying principles or rules at the trial court level"); *State* v. *Gonzales*, 186 Conn. 426, 433, 441 A.2d 852 (1982) (failure to cite applicable rule of practice was not fatal to defendant's claim when "the . . . record demonstrates no misunderstanding about what the defendant was seeking and why"). The state never complied with the trial court's order as it relates to statements, and the record reflects that defense counsel never withdrew his request for disclosure of the statements contained in the complainant's

Second, the ground on which the majority relies, i.e., that the contents of the journals were not adopted or approved by the author of the journals, is not a proper basis at this time for deciding the issue presented. To begin with, it is important to understand that not a single aspect of the majority's analysis—not one case citation or any thread of legal reasoning—has been the subject of briefing or argument by either party to this case, ever, in any court. The state did not raise this issue (or any other merits based issue regarding the defendant's claim that the state was obligated to disclose the journals as statements) in the Appellate Court. Nor did the state comply with the requirements of Practice Book § 84-11 (b) by requesting special permission to raise the issue in this court as an alternative ground for affirming the Appellate Court's judgment. See Practice Book § 84-11 (b) ("If such alternative grounds for affirmance . . . were not raised in the Appellate Court, the party seeking to raise them in the Supreme Court must move for special permission to do so prior to the filing of that party's brief. Such permission will be granted only in exceptional cases where the interests of justice so require."). Nor, finally, did the state brief the "adopted or approved" requirement in this court.[6]

journals. On this record, the defendant's claim is preserved and was not waived. Cf. *State* v. *Johnson*, 316 Conn. 45, 55, 111 A.3d 436 (2015) (claim that is initially preserved is not subsequently waived if defendant did not "engag[e] in affirmative conduct that unequivocally demonstrated his intention to abandon the previously preserved objection" (emphasis omitted; internal quotation marks omitted)); *State* v. *Thomas W.*, 301 Conn. 724, 734–35, 22 A.3d 1242 (2011) (claim that is initially preserved at trial is not subsequently waived through defense counsel's inaction if that inaction is due to "inadverten[ce]" rather than "a strategic decision").

[6] The state argues, in a single conclusory sentence in its brief to this court, that the complainant "neither signed nor otherwise adopted or approved the journals. Cf. Practice Book § 40-15 (1)." The state fails to cite any case law or record facts in support of this argument. The state's briefing on this issue is plainly inadequate to permit meaningful appellate review. See, e.g., *Maldonado* v. *Flannery*, 343 Conn. 150, 183 n.17, 272 A.3d 1089 (2022) ("[When] an issue is merely mentioned, but not briefed beyond a bare assertion of the claim, it is deemed to have been waived. . . . [M]ere conclu-

Instead, the state's position in this court is staked entirely on its claim that the term "statement" should be construed to apply "only to oral or written communications *conveyed to an investigating government agent*" consistent with the Jencks Act, 18 U.S.C. § 3500. (Emphasis added.) Rather than reject that claim on its merits (because there is no such requirement) or request supplemental briefing on the unbriefed issue, the majority proceeds to rest its decision on the resolution of that difficult and novel issue,[7] without input from the parties. This fact, in combination with the lack of the critical factual findings necessary to properly dispose of the issue on appeal, supports my view that a remand is necessary so that the trial court can properly adjudicate *all* of the issues in the first instance.

The majority's conclusion that the complainant did not adopt or approve her journals in accordance with Practice Book §§ 40-13A and 40-15 (1) is predicated on its erroneous assertion that "the issue of whether a witness' personal journals constitute a disclosable statement within the meaning of the rules of practice presents a pure question of law on this record . . . ." Part I A of the majority opinion. Specifically, the majority states that "whether a statement has been approved or adopted for purposes of the rules of practice may be

_____

sory assertions regarding a claim, with no mention of relevant authority and minimal or no citations from the record, will not suffice." (Internal quotation marks omitted.)).

[7] The difficult and novel issue is whether a complaining witness has "adopted or approved" statements contained in her own handwritten journals that describe the crimes charged. Practice Book § 40-15 (1). Resolution of this issue is challenging because there is no case law directly on point. The federal case law on which the majority relies to arrive at its holding involves the field notes of government agents, which is a far cry from a complaining witness' firsthand narrative of events in a personal journal described by the witness as "the best record" of what happened. Members of this court may ultimately disagree about the correct resolution of the issue, but we should agree that we should not reach any conclusion without full briefing.

a mixed question of fact and law, with the historical facts subject to review for clear error and the legal question of whether the established subsidiary facts constitute adoption or approval subject to plenary review," but concludes that "[t]here is no factual issue in the present case because the relevant subsidiary facts . . . are undisputed." Footnote 11 of the majority opinion. That is not so. It is well established under our case law that the adoption or approval of a witness' statement is a pure question of fact for the trial court in the first instance. See *State* v. *Anonymous (83–FG)*, 190 Conn. 715, 734–36, 463 A.2d 533 (1983) (remanding case for hearing to determine whether witness' unsigned field notes were adopted or approved under rules of practice); see also *State* v. *Cepeda*, 51 Conn. App. 409, 435, 723 A.2d 331, cert. denied, 248 Conn. 912, 732 A.2d 180 (1999); *State* v. *Black*, 23 Conn. App. 241, 244, 579 A.2d 1107, cert. denied, 216 Conn. 827, 582 A.2d 204 (1990).[8]

---

[8] As the majority correctly observes, the adoption or approval requirement is derived from the Jencks Act, 18 U.S.C. § 3500, and "this court consistently has relied on the history and judicial interpretations of the Jencks Act when constructing [Practice Book] § 40-15 and related rules of practice." Part I B of the majority opinion; see, e.g., *State* v. *Johnson*, 288 Conn. 236, 278, 951 A.2d 1257 (2008). The United States Supreme Court and the federal courts of appeals, like the courts of this state, consistently have held that whether a statement has been adopted or approved by a witness is a question of fact for the trial court in the first instance, which "may not be disturbed unless clearly erroneous." *Campbell* v. *United States*, 373 U.S. 487, 493, 83 S. Ct. 1356, 10 L. Ed. 2d 501 (1963); see, e.g., *Goldberg* v. *United States*, 425 U.S. 94, 108–10, 96 S. Ct. 1338, 47 L. Ed. 2d 603 (1976); *United States* v. *Smith*, 31 F.3d 1294, 1301 (4th Cir. 1994), cert. denied, 513 U.S. 1181, 115 S. Ct. 1170, 130 L. Ed. 2d 1124 (1995); *United States* v. *Wallace*, 848 F.2d 1464, 1470 n.7 (9th Cir. 1988); *United States* v. *Judon*, 581 F.2d 553, 554–55 (5th Cir. 1978).

The majority departs from this uniform body of law on the basis of *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 264, 112 A.3d 1 (2015), and *Bridgeport* v. *Plan & Zoning Commission*, 277 Conn. 268, 275, 890 A.2d 540 (2006), but these cases, which have nothing to do with the adoption or approval requirement in Practice Book §§ 40-13A and 40-15 (1), do not support the majority's conclusion. See footnote 11 of the majority opinion.

Although the trial court ordered the state to provide the defendant with any "statements made by [the complainant] in her journals concerning the sexual assault allegations," it did not make any explicit factual findings as to whether the complainant adopted or approved her Spanish language journals within the meaning of Practice Book §§ 40-13A and 40-15 (1). The majority nonetheless concludes that this court can resolve the issue for the first time on appeal because "the relevant subsidiary facts—namely, the complainant's statements about the journals during her testimony—are undisputed." Footnote 11 of the majority opinion. This also is not correct. The relevant factual issue is whether the complainant's statements evince her intent to stand by or vouch for the content of her journals. See, e.g., *United States* v. *Scotti*, 47 F.3d 1237, 1249 (2d Cir. 1995) (statement is adopted or approved if witness "vouches for . . . or intends to be accountable for [its] contents"). It is beyond dispute that intent is a question of fact to be resolved by the fact finder. Cf. *State* v. *Hedge*, 297 Conn. 621, 658–59, 1 A.3d 1051 (2010) ("[i]t is well established that the question of intent is purely a question of fact . . . the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one" (internal quotation marks omitted)). In the present case, the complainant's intent in this regard is hotly disputed.

At trial, the complainant testified that her therapist "would have me write a lot [in the journals] about either my relationship to [the defendant], with him, *how the abuse happened*. I would reflect a lot on how it made me feel, [what] I was missing, why I didn't want to talk. Sometimes in the journal, we'd write about—like if I was having family fights, *so my journals are the abuse that I lived with him*, but also family fights with my siblings [and] with my mom." (Emphasis added.) The complainant testified that her journals were her "words

through therapy" and acknowledged that she had reviewed "a few pages" before testifying in court. The journals were written "closer [in time] to the abuse" and, according to the complainant, are "*the best record . . . of what happened . . . .*" (Emphasis added.)

This testimony is more than sufficient to support a reasonable inference that the complainant was willing to, and indeed did, evince her intent to " 'stand by the statement[s]' " in her journals, "vouch for" their contents, and "be held accountable for inconsistencies between the journals and her testimony at trial."[9] Why would the complainant testify under oath that the journals describe "how the abuse happened" and "the abuse that [she] lived with [the defendant]," and that they were "the best record" of the abuse, if she had not been willing to stand by her journals and be held accountable for their contents, including any inconsistencies between the journals and her testimony at trial? Likewise, why would the complainant review her journals before testifying regarding the defendant's alleged sexual abuse, if not to refresh her recollection regarding the defendant's abusive conduct? I find it telling that the trial court explicitly found that the complainant "used some pages of the journals to refresh her memory [before] coming into court and testifying."[10]

---

[9] It is not clear what additional testimony, other than a formal, on the record canvass or advisement, would, in the majority's view, be sufficient to reflect the complainant's intention to "be held accountable in court for any omissions or inaccuracies in the journals, or that they could be used for cross-examination and impeachment purposes." Text accompanying footnote 14 of the majority opinion. I have found no case law, and the majority cites to none, requiring a formal canvass or advisement as a necessary predicate to the trial court's factual finding that a witness has adopted or approved a prior narrative description of the offense charged within the meaning of Practice Book §§ 40-13A and 40-15 (1).

[10] The trial court exercised its discretion to deny the defendant's request for disclosure of the journals under § 6-9 of the Connecticut Code of Evidence in light of (1) "the fact that [the complainant] testified that she . . . used [only] a few pages of [the] journals that consist of . . . at least, apparently, a couple hundred pages," (2) "the fact that the state would be reviewing all the journals with the obligation to turn over any exculpatory evidence

I recognize that there also was testimony that one page of the complainant's journals involved a counterfactual therapeutic exercise. Specifically, one single page, out of more than three hundred pages of handwritten journal entries, was translated and ordered to be disclosed to the defense as exculpatory material under *Brady.* See footnote 21 of this opinion. The complainant was questioned as to that specific entry, which pertained to sexual abuse allegedly perpetrated by someone other than the defendant. The complainant testified that this particular journal entry was the product of a "prompt" by her therapist "to rewrite [her] history of abuse." According to the complainant, she "imagined what it would've looked like to actually speak out [about the abuse]" by telling her mother, but she "never [actually] went and told [her] mother . . . . [I]n real life, this conversation didn't happen . . . ." The prompt was a therapeutic exercise "to understand that this is what it should've looked like to be able to talk about abuse in a normal family."

Thus, according to the complainant, one discrete journal entry was a counterfactual therapeutic exercise, but there is no evidence to support the suggestion that *all* of the complainant's journal entries were counterfactual or fictional in nature. As a matter of fact, the evidence is to the contrary. The complainant previously testified that her journals describe "how the abuse happened" and constitute "the best record" of the defendant's abusive conduct. A reasonable fact finder certainly could decide that some journal entries were not adopted or approved by the complainant while other journal entries (including the ones that the complainant

to the defendant," and (3) "the private nature of [the] journals." See Conn. Code Evid. § 6-9 (b) ("[i]f a witness, before testifying, uses an object or writing to refresh the witness' memory for the purpose of testifying, the object or writing need not be produced for inspection unless the court, in its discretion, so orders"). The trial court's ruling under the Code of Evidence is not before us on appeal.

used to refresh her recollection of the defendant's abusive conduct, as well as the entries described as "the best record" of the defendant's abuse) were adopted or approved by the complainant. Insofar as the evidence could be construed as conflicting, it is the role of the trial court as the fact finder, not the state's investigator or this court, to resolve the conflict. See, e.g., *State* v. *Samuel U.*, 348 Conn. 304, 321, 303 A.3d 1175 (2023) (recognizing that, in certain contexts, trial court must make "factual findings . . . when determining the admissibility of evidence"); cf. *State* v. *Crespo*, 246 Conn. 665, 679, 718 A.2d 925 (1998) ("[i]n a case in which the evidence is conflicting, it is the quintessential [fact finder] function to reject or accept certain evidence, and to believe or disbelieve any . . . testimony" (internal quotation marks omitted)), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999).

Finally, but not inconsequentially, to the extent that the majority concludes that the complainant's journal entries were not discoverable statements because they were written as part of "therapy exercises in which she was encouraged to imagine hypothetical assaults and counterfactual family environments"; part I B of the majority opinion; I fail to understand why these journal entries were not material information favorable to the defense that was therefore required to be disclosed under *Brady*.[11] See part II of this opinion. Fabricated

___

[11] The majority finds "no reason to believe" that the journals contain *Brady* material because "[a]ny descriptions of the defendant's sexual abuse contained in the journals could be purely inculpatory and consistent with the complainant's trial testimony" and because there is no evidence that "the journals contained '[f]abricated claims of abuse,' other than the counterfactual account that was disclosed." Footnote 14 of the majority opinion. The fact that we do not know whether the journals contain *Brady* material is my entire point. I could not disagree more, however, with the assertion that we have "no reason to believe" that there is anything exculpatory or inconsistent in the more than 300 pages of entries withheld by the prosecutors. Indeed, notwithstanding the prosecutors' assurances to the contrary, one of the four pages reviewed by the trial court *did* contain *Brady* material, which is reason enough to sustain a reasonable belief that judicial oversight

claims of abuse, including statements used by the complainant to refresh her recollection regarding a criminal defendant's allegedly abusive conduct before testifying at trial, plainly constitute impeachment material. To the extent that some or all of the journal entries contain inaccurate factual statements that were written by the complainant but not adopted or approved by her, the state's failure to disclose this material supports the defendant's claim that the *Brady* review conducted in this case was constitutionally inadequate. See part II of this opinion.

In a case such as this one, in which the trial court fails to make the requisite factual findings as to whether a witness adopted or approved a discoverable statement under our rules of practice, the appropriate remedy is to remand the case to the trial court with direction to "supplement the record with findings" that will facilitate "appellate review on the augmented record." *Goldberg* v. *United States*, 425 U.S. 94, 111, 96 S. Ct. 1338, 47 L. Ed. 2d 603 (1976); see, e.g., *State* v. *Anonymous (83–FG)*, supra, 190 Conn. 736. Accordingly, I would retain jurisdiction over the present appeal and remand the case to the trial court for an evidentiary hearing. See Practice Book § 60-2 (this "court may, on its own motion or upon motion of any party . . . (1) order a judge to take any action necessary to complete the trial

---

was necessary. See footnote 21 of this opinion. We know from the complainant's own testimony that the journals contain her extensive, firsthand description of the crimes of which the defendant was convicted, and we also know that the journals contain at least one instance in which the complainant fabricated a claim of abuse. If that does not give us reason to believe that the journals may contain impeachment material, I do not know what would trigger the need for in camera examination short of proof of an actual violation, which, of course, is impossible to demonstrate prior to disclosure. For this reason, to prevail on his *Brady* claim on appeal, the defendant "need only 'make some plausible showing' that exculpatory [or impeachment] material exists." *United States* v. *King*, 628 F.3d 693, 703 (4th Cir. 2011). Without any doubt, that showing has been made. See part II of this opinion.

court record for the proper presentation of the appeal . . . [or] (8) remand any pending matter to the trial court for the resolution of factual issues where necessary").

## II

In the seminal case of *Brady* v. *Maryland*, supra, 373 U.S. 83, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process [when] the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id., 87. A prosecutor has a constitutional duty of disclosure under *Brady*, even if there has been no request by the accused,[12] the evidence is impeaching but not necessarily exculpatory in nature,[13] or the prosecutor has no personal knowledge of the evidence, but other governmental actors do. See *Kyles* v. *Whitley*, 514 U.S. 419, 438, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). With respect to the latter category of evidence, the United States Supreme Court has emphasized that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case" and must implement "procedures and regulations . . . to [ensure the] communication of all relevant information on each case to every lawyer who deals with it." (Internal quotation marks omitted.) Id., 437–38. The duty of disclosure under *Brady* rests with the prosecutor because of "the special role played

---

[12] See *United States* v. *Agurs*, 427 U.S. 97, 110, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976) ("there are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request").

[13] See *United States* v. *Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) ("[i]mpeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule" because "[s]uch evidence is . . . favorable to an accused . . . so that, if disclosed and used effectively, it may make the difference between conviction and acquittal" (citation omitted; internal quotation marks omitted)).

by the American prosecutor in the search for truth in criminal trials." *Strickler* v. *Greene*, 527 U.S. 263, 281, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). More specifically, the individual prosecutors assigned to each particular case are personally responsible for implementing the procedures necessary to ensure *Brady* compliance because they alone are familiar with the disclosed and undisclosed evidence and have the specialized legal knowledge, training, and skill necessary "to gauge the likely net effect of all such evidence [collectively]" and to determine whether disclosure is required to satisfy the demands of due process. *Kyles* v. *Whitely*, supra, 437.

The majority concludes that the prosecutors in the present case fulfilled their constitutional duty under *Brady* and its progeny, even though they did not— and, without obtaining an English language translation, could not—read or familiarize themselves with the contents of the complainant's Spanish language journals, which, according to the complainant, contain "the best record" of the sexual abuse for which the defendant was convicted. To this day, no lawyer, judge, or other trained legal professional has reviewed these journals to determine whether they contain either exculpatory material that could be used to raise doubt about the defendant's guilt or as impeachment material that could be used to challenge the trial testimony of the complainant, whose credibility was determinative of the outcome of the case. Instead, the prosecutors delegated this crucial task to a bilingual investigator employed by the state's attorney's office—a nonlawyer who apparently has no specialized training in the constitutional requirements of *Brady* or the translation of written foreign language documents. Given the profound significance of the journals as "the best record" of the alleged sexual abuse, the lack of any evidence in the record of the investigator's qualifications to review the complainant's

Spanish language journals for *Brady* material, and the prosecutors' failure to implement any procedures by which they would learn personally of the content of the journals, I believe it is clear that the constitutional requirements of *Brady* have not been satisfied.[14] Accordingly, I would remand the case to the trial court with direction to order the journals translated into English and to review them in camera for *Brady* material.

It is no accident that the law places the obligation to comply with the requirements of *Brady* squarely on the shoulders of the individual prosecutor or prosecutors trying the case. As the Appellate Court observed and the majority acknowledges, "the individual prosecutor or prosecutors trying a specific case bear the ultimate responsibility for compliance with the disclosure of evidence as required by *Brady* and its progeny." *State* v. *Andres C.*, supra, 208 Conn. App. 857; see part II of the majority opinion. The prosecutors are the "architect[s]" of the criminal trial; *Brady* v. *Maryland*, supra, 373 U.S. 88; and "the final arbiters of the government's obligation to ensure fair trials." *Kyles* v. *Whitley*, supra, 514 U.S. 438. The United States Supreme Court has emphasized that the prosecutor has an affirmative "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Id., 437. "[T]he prosecutor has the means to discharge the government's *Brady* responsibility" by establishing "procedures and regulations" ensuring the "communication of all relevant information on each case to every lawyer who deals with it." (Internal quota-

_____

[14] Although, in my view, the *Brady* review in this case failed to comport with constitutional requirements, I also agree with Justice D'Auria's concurrence and dissent that, insofar as the scope of the prosecutor's constitutional duties are uncertain, a remand to the trial court for an English language translation and in camera review of the complainant's journals is necessary "either as a prophylactic rule or in this case alone" under the unusual circumstances presented. Part II of the concurring and dissenting opinion.

tion marks omitted.) Id., 438. The prosecutors' responsibility under *Brady* is not merely ceremonial or titular. Their role is meaningful, active, and substantive.

It should be obvious why the ultimate duty of disclosure under *Brady* rests with the prosecutors assigned to the case. First, *Brady* encompasses a set of technical and nuanced legal rules, and the prosecutors have the specialized legal knowledge, training, and experience necessary to comply with *Brady*'s disclosure requirements. The United States Supreme Court has emphasized precisely this point in a case involving civil liability for failure to train prosecutors on compliance with *Brady*'s requirements, pointedly observing that prosecutors "are trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment." *Connick* v. *Thompson*, 563 U.S. 51, 64, 131 S Ct. 1350, 179 L. Ed. 2d 417 (2011); see id., 54. Prosecutors "know what *Brady* entails and [how] to perform legal research when they are uncertain." Id., 67.

*Brady* requires not only a comprehensive understanding of the applicable legal rules, but also the professional training and acumen to exercise the *judgment* required to properly apply those rules to the unique factual context of any given case. Determining whether a particular piece of evidence is favorable and material within the meaning of *Brady* typically requires the exercise of legal judgment and expertise that only the prosecutors assigned to the case, with their knowledge of *Brady*'s constitutional requirements and their familiarity with all of the other evidence, are in a position to make. See, e.g., *Moldowan* v. *Warren*, 578 F.3d 351, 401–402 (6th Cir. 2009) (Kethledge, J., concurring in the judgment in part and dissenting in part) ("the *Brady* duty is uniquely tailored to prosecutors" because it requires exercise of "a judgment that prosecutors . . . are trained to make"), cert. denied, 561 U.S. 1038, 130

S. Ct. 3504, 177 L. Ed. 2d 1114 (2010). As the United States Supreme Court has observed, "*Brady* has gray areas and some *Brady* decisions are difficult . . . ." *Connick* v. *Thompson*, supra, 563 U.S. 71. A nonlawyer without intimate knowledge of the case—an investigator, for example—generally is unequipped to make those decisions.

Second, prosecutors are bound by unique ethical obligations, both as attorneys admitted to practice law[15] and as representatives of the state in a criminal prosecution. "It is well established that [a] prosecutor is not an ordinary advocate. His [or her] duty is to see that justice is done . . . ." (Internal quotation marks omitted.) *Gomez* v. *Commissioner of Correction*, 336 Conn. 168, 186–87, 243 A.3d 1163 (2020). "As a representative of the people of the state, [the prosecutor] is under a duty not solely to obtain convictions but, more importantly, (1) to determine that there is reasonable ground to proceed with a criminal charge . . . (2) to see that impartial justice is done [in the case of] the guilty as well as the innocent; and (3) to ensure that all evidence

---

[15] As attorneys, prosecutors are required to "satisfy character and fitness standards . . . and are personally subject to an ethical regime designed to reinforce the profession's standards." *Connick* v. *Thompson*, supra, 563 U.S. 65. A prosecutor "who violates his or her ethical obligations is subject to professional discipline, including sanctions, suspension, and disbarment." Id., 66; see, e.g., *Statewide Grievance Committee* v. *Ganim*, 311 Conn. 430, 452, 87 A.3d 1078 (2014) ("An attorney as an officer of the court in the administration of justice, is continually accountable to it for the manner in which he exercises the privilege [that] has been accorded him. His admission is [on] the implied condition that his continued enjoyment of the right conferred is dependent [on] his remaining a fit and safe person to exercise it . . . ." (Internal quotation marks omitted.)); *Doe* v. *Connecticut Bar Examining Committee*, 263 Conn. 39, 51, 818 A.2d 14 (2003) ("[g]ood moral character is a necessary and proper qualification for admission to the bar [in this state]" (internal quotation marks omitted)); see also General Statutes § 51-84 (b) (providing Superior Court with authority to "fine an attorney for transgressing its rules and orders . . . [and to] suspend or displace an attorney for just cause"); Practice Book § 2-44 ("[t]he Superior Court may, for just cause, suspend or disbar attorneys").

tending to aid in the ascertaining of the truth be laid before the court, whether it be consistent with the contention of the prosecution that the accused is guilty." (Citation omitted; internal quotation marks omitted.) *Massameno* v. *Statewide Grievance Committee*, 234 Conn. 539, 556–57, 663 A.2d 317 (1995); see Rules of Professional Conduct 3.8, commentary (prosecutor is "a minister of justice" with "[the] specific [obligation] to see that the defendant is accorded procedural justice and that guilt is decided [on] the basis of sufficient evidence"). A prosecutor is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." (Internal quotation marks omitted.) *Strickler* v. *Greene*, supra, 527 U.S. 281.

*Brady* and its progeny, in short, serve as "central bulwarks against injustice in our criminal justice system." *Gonzalez* v. *Wong*, 667 F.3d 965, 981 (9th Cir. 2011), cert. denied sub nom. *Chappell* v. *Gonzales*, 568 U.S. 928, 133 S. Ct. 155, 184 L. Ed. 2d 234 (2012); see also *United States* v. *Bagley*, 473 U.S. 667, 675, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) ("[t]he *Brady* rule is based on the requirement of due process," and its purpose is "to ensure that a miscarriage of justice does not occur"). It is not a mere procedural "discovery rule, but a rule of fairness and minimum prosecutorial obligation." *United States* v. *Beasley*, 576 F.2d 626, 630 (5th Cir. 1978), cert. denied, 440 U.S. 947, 99 S. Ct. 1426, 59 L. Ed. 2d 636 (1979). "By requiring the prosecutor to assist the defense in making its case," *Brady* is premised on the principle "that the prosecutor's role transcends that of an adversary . . . ." *United States* v. *Bagley*, supra, 675 n.6. As ministers of justice, the prosecutors trying the case have "a special duty commensurate with

[their] unique power, to [ensure] that defendants receive fair trials." (Internal quotation marks omitted.) *Gomez* v. *Commissioner of Correction*, supra, 336 Conn. 187.

My analysis thus begins with the premise that the prosecutor occupies a unique role in executing the legally complex and fact dependent disclosure obligation under *Brady*, and a layperson with no specialized training or education ordinarily is not equipped with the knowledge, skill, and judgment necessary to comply with *Brady*'s constitutional requirements.[16] This is most certainly true in a case such as this one, which required the prosecutors to review hundreds of pages of journal entries, written by the complaining witness herself, regarding the very events at the center of the criminal charges against the defendant. In this context, giving a nonlawyer investigator a brief, midtrial, backroom lecture on "*Brady* in a nutshell" is a grossly inadequate substitute for the kind of legal education, training, and experience that would qualify a person to conduct the meaningful review that *Brady* mandates.[17]

A brief examination of the circumstances of this case demonstrates the flawed nature of the procedures utilized by the prosecutors to discharge their *Brady* obligations. To begin with, even if I were to assume, purely

---

[16] As I discuss later in this opinion, I do not rule out the possibility that a nonlawyer may conduct a constitutionally adequate *Brady* review under certain discrete circumstances, such as, for example, reviewing law enforcement personnel files for disciplinary information contained in records within the custody or control of a separate agency.

[17] At trial, the prosecutors informed the trial court that their investigator had been employed "with the state's attorney's office for fifteen years, [that] she has been an investigator in [the] office for five years, [that] she is bilingual, [and that] she is a 2013 graduate of Albertus Magnus College with a major in criminal justice. She was instructed very carefully . . . as far as what she was looking for; [the prosecutors assigned to the case] explained to her very carefully what the state's obligation is for exculpatory and *Brady* material." According to the prosecutors, the investigator "spent about ten hours reviewing [the Spanish language journals] . . . and, whenever she had any questions, she would talk to" the prosecutors assigned to the case.

for the sake of argument, that the investigator was informed in general terms of the constitutional duty of disclosure under *Brady*, there is no basis in the record to suggest that the investigator was familiar with the large volume of factual information and the manifold underlying legal principles necessary to properly apply *Brady* under the particular circumstances of this case. In terms of the facts, we have no reason to think that the investigator was made aware of or had the requisite familiarity with the complainant's pretrial statements or trial testimony, which was necessary to determine whether the description of events set forth in her journals ("the best record" of what happened) was inconsistent with the version of events detailed in those pretrial statements and her testimony. Without access to the complainant's other descriptions of the abuse, including the account of events she gave in her trial testimony, it was impossible for the investigator to determine whether there were any inconsistent statements in the complainant's Spanish language journals that were required to be disclosed to the defense.

There also is no indication that the investigator was familiar with the complex and nuanced legal definition of an "inconsistent statement," which was necessary to review the complainant's journals for *Brady* material. "Inconsistent statement" is a legal term of art that means something very different to licensed attorneys than to laypersons. A prior statement not only is inconsistent under the law if it directly contradicts a later statement, but it also meets the legal definition if it includes "omissions, changes of position, denials of recollection or evasive answers." Conn. Code Evid. § 6-10 (a), commentary. "Inconsistency in effect, rather than contradiction in express terms, is the test," and, thus, "[i]n determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be

examined." (Internal quotation marks omitted.) *State* v. *Whelan*, 200 Conn. 743, 748 n.4, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). Additionally, "the inconsistency must be substantial and relate to a material matter." (Emphasis omitted.) *State* v. *Richardson*, 214 Conn. 752, 763, 574 A.2d 182 (1990). Without a full and accurate comprehension of the legal definition of an inconsistent statement, and without a detailed understanding of the complainant's trial testimony, the investigator could not possibly review the complainant's journals for any inconsistent statements that could be used to impeach the complainant's credibility.

Moreover, trained lawyers know that impeachment material is not limited to inconsistent statements, but also includes other evidence that might affect a witness' credibility, such as evidence of bias, motive, interest, or reputation for truthfulness. "When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [the] general rule [of disclosure under *Brady*]." (Internal quotation marks omitted.) *Giglio* v. *United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). In this case, the reliability of the complainant's testimony was outcome determinative. There was no physical evidence that the defendant committed the crimes charged; nor did anyone witness the sexual abuse at the time it occurred. The state's case hinged entirely on the testimony of a complainant who was a child at the time of the sexual abuse, and her credibility was the crucial factor in the case. See, e.g., *State* v. *Fernando V.*, 331 Conn. 201, 215–16, 202 A.3d 350 (2019). Any evidence that would have affected the trier of fact's assessment of the complainant's credibility was material and subject to disclosure under *Brady*. See *State* v. *White*, 229 Conn. 125, 136–37, 640 A.2d 572 (1994) ("[t]his court has stated many times that when

the prosecution's case hinges entirely on the testimony of certain witnesses, information affecting their credibility is material [under *Brady*]"); *Demers* v. *State*, 209 Conn. 143, 161–62, 547 A.2d 28 (1988) (if "a conviction depends entirely [on] the testimony of certain witnesses . . . information affecting their credibility is material in the constitutional sense [i.e., under *Brady*, because] . . . if they are not believed a reasonable doubt of guilt would be created" (internal quotation marks omitted)). On this record, there is no reason to believe (and good reason to doubt) that the state's investigator possessed the technical knowledge or training to properly review the complainant's Spanish language journals for any such impeachment information. Nor does anything in the record indicate that she even attempted to do so.[18]

Again, purely for the sake of argument, even if I were to assume that the prosecutors' ad hoc *Brady* tutorial conveyed to the investigator all pertinent aspects of the *Brady* doctrine and that the investigator absorbed from the prosecutors' lesson all of the legal learning required to identify impeachment material, the investigator nonetheless could not conduct a constitutionally adequate *Brady* review because she was in no position to exercise the discretion or judgment necessary to determine whether any potentially inconsistent statements and impeachment material triggered a disclosure obligation under *Brady*. Except perhaps in the most straightforward cases involving no exercise of judgment, the decision to disclose under *Brady* is not a ministerial task. "[T]here are no bright lines or fixed rules," and many scholars, courts, and attorneys have struggled to delineate the precise contours of a prosecu-

---

[18] Although the prosecutors instructed the investigator to review the complainant's Spanish language journals for inconsistent statements, there is no indication that they also instructed the investigator to review the complainant's journals for other types of impeachment evidence, such as evidence of bias, motive, interest, or reputation for truthfulness.

tor's constitutional duty of disclosure under *Brady.* B. Gershman, "Between *Brady* Discretion and *Brady* Misconduct," 123 Dick. L. Rev. 661, 670 (2019); see id., 662 (examining various hypothetical situations that require prosecutor "to exercise considered judgment, or discretion"); see also *Connick* v. *Thompson,* supra, 563 U.S. 71 ("*Brady* has gray areas and some *Brady* decisions are difficult"); *Kyles* v. *Whitley,* supra, 514 U.S. 439 (under *Brady,* prosecutors are "forced to make judgment calls about what would count as favorable evidence, owing to the very fact that the character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record"); *United States* v. *Sipe,* 388 F.3d 471, 488 (5th Cir. 2004) ("materiality determinations under *Brady* are always difficult"). Stated simply, the *Brady* review in the present case required extensive legal training, comprehensive knowledge of the legal and factual issues at issue, and the exercise of judgment—none of which the state's investigator possessed based on the trial court record before us.

The deficiencies in the state's review procedures do not stop there. There is no indication in the record that the state's investigator even possessed the foreign language qualifications necessary to read and translate written documents. The investigator was bilingual, but an understanding of the Spanish and English languages alone provides no assurance of linguistic competence for purposes of the kind of detailed and nuanced review necessary to ensure *Brady* compliance. The Spanish language is not monolithic—"there are more than nineteen dialectical forms of Spanish . . . ." (Internal quotation marks omitted.) I. Dominguez-Urban, "The Messenger as the Medium of Communication: The Use of Interpreters in Mediation," 1997 J. Disp. Resol. 1, 30. Given the existence of these different dialects, "Spanish speakers from different countries are not necessarily

able to communicate effectively. Even within the same country, there may be regional and class differences in dialect or accent. The failure to recognize these differences can lead to [miscommunications and] disastrous consequences."[19] Id.

The provision of translation and interpretation services is "an imprecise process" that easily "may give rise to misunderstanding and misinterpretation of the speaker's intent." M. Shulman, Note, "No Hablo Inglés: Court Interpretation as a Major Obstacle to Fairness for Non-English Speaking Defendants," 46 Vand. L. Rev. 175, 176–77 (1993). To ameliorate these risks, court-appointed translators for the Connecticut Judicial Branch must pass written, oral, and ethics examinations, agree to be bound by the Code of Professional Responsibility for Court Interpreters of the Judicial Branch, and be sworn by a Superior Court judge. See Connecticut Judicial Branch, Interpreter and Translator Services Unit (ITS), available at https://jud.ct.gov/jobs/interpreter.htm#Role (last visited June 11, 2024). These requirements ensure that the translator possesses the foreign language proficiency necessary to translate written documents and understands the ethical obligation to translate "accurately and faithfully without indicating any personal bias, avoiding even the appearance of partiality." Connecticut Judicial Branch, Code of Professional Responsibility for Court Interpreters of the State of Connecticut Judicial Branch, Canon 7, p. 4, available at https://www.ncsc. org/__data/assets/pdf_file/0032/19697/connecticut-inter

---

[19] For example, a person "hearing the Spanish world 'molestar' may believe that a sexual molestation is being described. In fact, the word is correctly translated as 'to bother' rather than 'to molest.' " I. Dominguez-Urban, supra, 1997 J. Disp. Resol. 25 n.133; see also, e.g., M. Shulman, Note, "No Hablo Inglés: Court Interpretation as a Major Obstacle to Fairness for Non-English Speaking Defendants," 46 Vand. L. Rev. 175, 176 and n.3 (1993) (explaining that, depending on dialect and context, Spanish word " 'kilo' " can mean either " 'kilogram' " or " 'cent,' " and that improper translation of this word at trial resulted in wrongful conviction on drug charges).

preter_code_of_ethics_commentary_2010_02.pdf (last visited June 11, 2024). Because the investigator had no known qualifications as a translator and was not operating within a framework of enforceable ethical obligations, I cannot conclude that she was competent to translate the complainant's Spanish language journals into English, much less to review those journals for *Brady* material.

Even if the state's lay investigator otherwise had been qualified by virtue of her legal training, knowledge of the evidence in the case, exercise of judgment, language proficiency, and ethical obligations to review the complainant's Spanish language journals for *Brady* material, there is no indication that adequate policies and procedures existed "to [ensure the] communication of all relevant information" to the individual prosecutors trying the case. (Internal quotation marks omitted.) *Kyles* v. *Whitley*, supra, 514 U.S. 438; see, e.g., *Fontenot* v. *Allbaugh*, 402 F. Supp. 3d 1110, 1165 (E.D. Okla. 2019) ("[t]he lack of any organizational structure or policy ensuring the proper disclosure of exculpatory and impeachment evidence from the [state and local law enforcement agencies] to the . . . [d]istrict [a]ttorney's [o]ffice resulted in systemic *Brady* violations"), aff'd sub nom. *Fontenot* v. *Crow*, 4 F.4th 982 (10th Cir. 2021), cert. denied,    U.S.    , 142 S. Ct. 2777, 213 L. Ed. 2d 1015 (2022). The prosecutors themselves did not read the journals; nor were they able to do so—they did not understand Spanish. The investigator neither produced a written translation nor read the journals in translation aloud to the prosecutors. The prosecutors consequently were unable to effectively supervise, verify, question, or override the investigator's *Brady* determinations. Instead, the prosecutors relied entirely on the investigator to read the complainant's Spanish language journals and to identify potential *Brady* material. In the face of this wholesale delegation of the prosecu-

tors' constitutional duty of review, the majority resorts to euphemisms, referring to the investigator as providing "help" or "assistance" to the prosecutors. This characterization is accurate only if we can agree that the investigator helped and assisted by *conducting* the *Brady* review.[20] The simple truth is that the prosecutors did not review the complainant's Spanish language journals—they delegated this task entirely to their bilingual investigator. The only *Brady* related decisions made by the prosecutors were those that the investigator, in her uninformed discretion, chose to bring to their attention.[21] The prosecutors' wholesale delegation of their

[20] As Justice D'Auria puts the point in his concurrence and dissent, "[t]he investigator reviewed the journals. Period. The prosecutors did not." Footnote 2 of the concurring and dissenting opinion. Regardless of the euphemistic terminology employed by the majority, this is the very "definition of 'delegating' review of the journals." Id.

[21] The record reflects that the prosecutors learned about a very small portion of the information contained in the complainant's Spanish language journals because four pages were translated into English and communicated to the prosecutors, who, in turn, submitted them to the trial court for an in camera inspection out of an "abundance [of] caution . . . ." Significantly, the prosecutors repeatedly represented to the court that these four pages did *not* contain any *Brady* or exculpatory material but, instead, were subject to in camera review under General Statutes § 54-86f (a) because they involved evidence of the complainant's sexual conduct. After reviewing the four pages, the trial court determined that one of the pages did, in fact, contain favorable material under *Brady* because it could be used to impeach the complainant's testimony regarding the reason for her delayed disclosure of the sexual abuse. In other words, of the four journal pages that were translated into English, the record demonstrates conclusively that one of those pages contained *Brady* material that went unrecognized and unacknowledged by the prosecutors. This fact does not inspire confidence in the prosecutors' own ability to identify *Brady* material, which further casts doubt on the propriety of delegating that responsibility to a nonlawyer instructed by the prosecutors and bolsters my conclusion that the state's *Brady* review was inadequate in this case.

The majority acknowledges that "the [prosecutors'] statement that the four pages contained no *Brady* material was not correct" but concludes that, "even if the prosecutor[s] may have made a mistake in [their] *Brady* analysis on one document, that would not demonstrate conclusively that [they] did not understand [their] obligations under *Brady*." Footnote 27 of the majority opinion. Conclusive or not, the *only* evidence in the record of the prosecutors' understanding of *Brady* is an instance in which they got it wrong. Because the investigator's understanding of what constitutes *Brady*

responsibility under *Brady* to assess the substance of these crucially important documents—material that realistically could have contained information determinative of the complainant's credibility and the outcome of the case—was an abdication of their prosecutorial function and a dereliction of their constitutional duty. See, e.g., *United States* v. *Price*, 566 F.3d 900, 903 (9th Cir. 2009) ("a prosecutor cannot evade [his or her] duty simply by becoming or remaining ignorant of" *Brady* material).[22]

To support its conclusion to the contrary, the majority relies on "persuasive authority [holding] that a prosecutor does not have a constitutional obligation to personally review materials in the government's possession to determine whether disclosure is required under *Brady*." Part II of the majority opinion, citing *United States* v. *Jennings*, 960 F.2d 1488, 1491 (9th Cir. 1992), *United States* v. *Smith*, 552 F.2d 257, 262 (8th Cir. 1977), and *Stacy* v. *State*, 500 P.3d 1023, 1038 (Alaska App. 2021). These few cases provide exceedingly weak authority for this court to rely on in rendering its decision. They are not binding on this court and are persuasive only insofar as we agree with their legal analysis, logic,

material necessarily was dependent on and derivative of the prosecutors' understanding, one can only conclude that the investigator labored under the same misunderstanding as her instructors. The majority misses the point by taking comfort in the fact that, even if the prosecutors' understanding of *Brady* was flawed, the trial court nonetheless undertook a proper *Brady* review of the four pages of material submitted by the prosecution. The issue is not whether the trial court properly applied *Brady*; it is whether the prosecutors and their investigator did, and, on this record, the evidence indicates that they did not. This fact demonstrates why in camera review by the trial court of the entirety of the complainant's journals is required to ensure that the defendant received a fair trial consistent with *Brady* and its progeny.

[22] I do not suggest that the prosecutors acted deliberately in this regard. These decisions were made in the midst of trial under unforeseen and unusual circumstances that took everyone by surprise, and there is nothing to suggest that the prosecutors intended to evade their constitutional obligation under *Brady* or otherwise act improperly.

and reasoning. More to the point, regardless of whether we agree with the general principles expressed in these cases, they are plainly distinguishable from the present circumstances, and their reasoning has no application to the operative facts in this case. *Jennings, Smith,* and *Stacy* all involve *Brady* material allegedly contained in the personnel files of other governmental agencies, rather than a complainant's firsthand description of the alleged crimes written in her own hand in a set of journals held in the prosecutors' possession. See *United States* v. *Jennings,* supra, 1492 n.3 (federal law enforcement personnel files); *United States* v. *Smith,* supra, 261 (same); *Stacy* v. *State,* supra, 1038 (personnel files in possession of state and local law enforcement agencies). Personnel files pose unique challenges with respect to prosecutors' fulfillment of their *Brady* obligation because there are many "state statutes and local policies mak[ing] police personnel files so confidential that not even the prosecutor can look inside them to search for *Brady* material." J. Abel, "*Brady*'s Blind Spot: Impeachment Evidence in Police Personnel Files and the Battle Splitting the Prosecution Team," 67 Stan. L. Rev. 743, 762 (2015); see, e.g., *People* v. *Superior Court,* 61 Cal. 4th 696, 709–11, 377 P.3d 847, 206 Cal. Rptr. 3d 606 (2015) (California statute precludes both prosecutors and defense attorneys from personally accessing law enforcement personnel files unless certain procedures are followed consistent with *Pitchess* v. *Superior Court,* 11 Cal. 3d 531, 522 P.2d 305, 113 Cal. Rptr. 897 (1974)); see also, e.g., *Stacy* v. *State,* supra, 1038 ("state personnel files are confidential under Alaska law," and prosecutor could not personally review them). Given the confidentiality of personnel files and the lack of direct prosecutorial access to search such files for *Brady* material, many states have adopted policies and procedures to ensure that the agency maintaining custody and control of these files searches them for *Brady*

material and then communicates any such material to the prosecutors trying the case. See, e.g., *Stacy* v. *State*, supra, 1038 ("[t]he Anchorage Police Department (APD) and the Department of Law (DOL) have agreed to an [ongoing] process by which the APD will advise one [DOL] representative . . . of its substantiation of an officer's or employee's misconduct involving untruthfulness or bias . . . to facilitate compliance with the duty of [the] police and prosecutors under *Giglio* while respecting the officer's or employee's privacy interest in the confidential personnel records"); *People* v. *Superior Court*, supra, 721 ("the police department has laudably established procedures to streamline the *Pitchess/Brady* process," pursuant to which "[i]t notified the prosecution, which in turn notified the defendant, that the officers' personnel records might contain *Brady* material"); see also *United States* v. *Jennings*, supra, 1492 n.3 (noting existence of United States Department of Justice policy requiring "the files of law enforcement officers . . . to be examined by the appropriate agency's attorney or his staff . . . [who] will notify the federal prosecutor assigned to the case if any potential *Brady* material is found").

Wholly apart from the unique legal status of personnel files in the possession of other state agencies, the task of reviewing personnel files for impeachment material normally is a simple and focused exercise raising none of the challenges involved in the present case. This case does not involve the ministerial review of a testifying witness' personnel file to identify disciplinary information. The material at issue in the present case contains the complaining witness' own narrative description of the sexual abuse she claims to have suffered at the hands of the defendant. These journals cover the very same events that lie at the heart of the state's case and the complainant's trial testimony. Regardless of whether the journals ultimately are determined to con-

tain *Brady* material, their contents, as described by the complainant herself, present the reviewer with judgment calls regarding the obligation to disclose under *Brady.* No legal privilege attaches to these materials, and they are in the actual possession of the prosecutors, which makes them physically available for their direct review. I have found no case law, and the majority cites to none, standing for the proposition that prosecutors may delegate their duty to review a complaining witness' description of the crimes charged for *Brady* material to a nonlawyer staff member. And for good reason. It is a quintessential prosecutorial function to review for impeachment material a complainant's written, firsthand account of the crimes with which the defendant has been charged and to compare that written, firsthand account to the complainant's trial testimony to determine whether there are any discrepancies, evasions, inconsistencies, or omissions in the complainant's description of events that could be used to impeach her credibility. Such a nuanced task requires the legal training, experience, skill, and judgment of an attorney familiar with the operative legal claims and defenses, as well as the facts of the case, all viewed through the lens of *Brady*'s constitutional requirements. A layperson simply is not equipped to conduct the sophisticated and technical legal analysis that *Brady* requires in this context. See Practice Book § 2-44A (a) (2) (defining "[t]he practice of law" as "ministering to the legal needs of another person and applying legal principles and judgment to the circumstances or objectives of that person," including "[g]iving advice or counsel to persons concerning or with respect to their legal rights or responsibilities or with regard to any matter involving the application of legal principles to rights, duties, obligations or liabilities").

Lastly, this is not a case involving a large "volume of records" necessitating an "extraordinary [delay] in

the trial" to permit the prosecutors to review the complainant's journals. Part II of the majority opinion. The complainant's journals total 333 pages, and a member of the two lawyer prosecution team surely could have reviewed an English language translation of the journals during trial, especially given that there was a nine day break in the trial proceedings.[23] Even if the complainant's journals were more voluminous, "the state's obligation under *Brady* does not vary depending on how convenient or inconvenient it is for the state to comply with its duty to provide exculpatory evidence to the defendant." (Footnote omitted.) *State* v. *Guerrera*, 331 Conn. 628, 656–57, 206 A.3d 160 (2019) (*McDonald, J.,* concurring). In the "context of [a] 'voluminous mass of files, tapes and documentary evidence' in [the] state's possession . . . 'the prosecutor retains the constitutional obligation of initially screening the materials before him and handing over to the defense those items to which the defense is unquestionably entitled under *Brady*' . . . ." Id., 657 (*McDonald, J.,* concurring), quoting *Emmett* v. *Ricketts*, 397 F. Supp. 1025, 1043 (N.D. Ga. 1975).

For the foregoing reasons, on this record, I conclude that the investigator's review of the complainant's journals for *Brady* material was not constitutionally adequate, and, therefore, the journals were suppressed (i.e., withheld) within the meaning of *Brady*.[24] In a case such as this one, in which the defendant has made a plausible showing that specifically identified, suppressed evidence may contain *Brady* material,[25] but the evidence

---

[23] Due to the illness of the trial judge, there were no trial proceedings from February 16 through 24, 2019.

[24] In light of my conclusion, I see no need to adopt the prophylactic rule proposed by the defendant.

[25] The majority does not address whether the complainant's journals were unlawfully suppressed by the prosecutors because, it asserts, the defendant "claims only that the procedure that the [prosecutors] used to review the journals was constitutionally inadequate." Footnote 28 of the majority opinion. The majority's unjustifiably narrow construction of the defendant's claim overlooks the fact that the defendant challenges both the procedure

has not been reviewed by the prosecutor, defense counsel, or the trial court, the appropriate remedy is to remand the case to the trial court for in camera review.[26] See, e.g., *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 57–58, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987) (when "it is impossi-

used to review the complainant's journals and the prosecutors' refusal to disclose the journals to the defendant, even though there was a reasonable basis to believe that they contained favorable impeachment material. Given that defense counsel requested the complainant's journals as soon as their existence came to light, the trial court ordered the prosecutors to take possession of the handwritten journals and to review them for *Brady* material, the journals were in the exclusive possession and control of the prosecutors, and the prosecutors refused to disclose the journals to the defendant, there is no doubt that the journals were suppressed within the meaning of *Brady*. See, e.g., *Demers* v. *State*, supra, 209 Conn. 153–54 (concluding that evidence was suppressed within meaning of *Brady* because state "had both access to and control over the documents" (internal quotation marks omitted)).

[26] The defendant claims that a *Brady* violation is patent on the face of the record because the complainant testified that her journals contain a history of the defendant's sexually abusive conduct, and, therefore, the journals either contain inculpatory evidence or contain no such inculpatory evidence and constitute impeachment material. The defendant oversimplifies the issue. *Brady* requires the disclosure of material, favorable evidence, not inculpatory evidence. Favorable evidence includes impeachment material, such as prior inconsistent statements and evidence of bias, motive, interest, and reputation for truthfulness. It is possible (albeit unlikely) that the complainant's journals contain no impeachment material because her description of the defendant's sexually abusive conduct may be entirely consistent with her trial testimony. It is also possible that the journals contain statements that are inconsistent with her trial testimony and, thus, constitute impeachment material. Notably, impeachment material includes, but is not limited to, new inculpatory information like additional instances of sexual abuse or additional details regarding the sexual abuse to which the complainant testified at trial, which would be a substantial and material omission from the complainant's trial testimony. See, e.g., *State* v. *Reed*, 174 Conn. 287, 303, 386 A.2d 243 (1978) ("[i]f a former statement fails to mention a material fact presently testified to, which it should have been natural to mention in the prior statement, the prior statement is sufficiently inconsistent" to constitute impeachment evidence (internal quotation marks omitted)); cf. *State* v. *Carrion*, 313 Conn. 823, 835–36, 842, 100 A.3d 361 (2014) (trial court properly admitted video-recorded interview of child victim of sexual abuse as inconsistent statement because her trial testimony "was often inconsistent with the details [that] she [had] provided during her [video-recorded] interview" (internal quotation marks omitted)). It is not clear what information the journals contain, and that is why we must remand the present case for the trial court to order a translation of the journals

ble to say whether any information" is required to be disclosed under *Brady* because neither prosecutor, defense counsel, nor trial court reviewed information, defendant is "entitled to have the [information] reviewed by the trial court" in camera to determine whether it contains *Brady* material); *United States* v. *Alvarez*, 358 F.3d 1194, 1209 (9th Cir.) ("[b]ecause neither we nor the trial court know what it is we are attempting to review [for a *Brady* violation]," appropriate remedy is to "remand to the [trial] court for an evidentiary hearing to determine whether the government had discharged its obligation to provide the defense with material exculpatory evidence, including impeachment evidence, within its possession" (internal quotation marks omitted)), cert. denied sub nom. *Valenzuela* v. *United States*, 543 U.S. 887, 125 S. Ct. 126, 160 L. Ed. 2d 148 (2004); *United States* v. *Rosario-Peralta*, 175 F.3d 48, 56–57 (1st Cir. 1999) (retaining jurisdiction over appeal and remanding case to trial court to review specifically identified evidence in camera to determine whether *Brady* required its disclosure); *United States* v. *Kiszewski*, 877 F.2d 210, 215–16 (2d Cir. 1989) (when "the jury's verdict turned on the credibility" of witness for whom alleged impeachment material had not been disclosed, it was "necessary to remand [the] case to allow the [trial] court to conduct an in camera examination of the [evidence] to determine whether [it] should have been disclosed and, if so, whether [the defendant] is entitled to a new trial").[27]

Despite the significant risk that the defendant was deprived of his constitutional right to a fair trial, the major-

---

and to examine them in camera for favorable information required to be disclosed to the defense pursuant to *Brady*.

[27] Additional federal authority exists, such as the cases cited by Justice D'Auria in part IV of his concurrence and dissent. The majority's assertion that this federal authority is distinguishable because, in the present case, the defendant does not claim on appeal that the state "refused [his] request to review specific evidence for *Brady* material" fails to confront the essence of the defendant's argument. Footnote 21 of the majority opinion.

ity declines to address whether the prosecutors' delegation of their duty to review the complainant's Spanish language journals for *Brady* material was constitutionally adequate on the present factual record, reasoning that (1) the defendant only requested a prophylactic rule and did not expressly raise a "freestanding" *Brady* claim, and (2) the record is inadequate for review under the second prong of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Part II of the majority opinion. The majority's characterization of the defendant's claim as something other than a *Brady* claim misapprehends the fundamental issue on appeal. The issue certified on appeal is whether "the *Brady* review . . . of the complainant's journals by a nonlawyer member of the state's attorney's office was constitutionally adequate . . . ." (Citation omitted.) *State* v. *Andres C.*, 342 Conn. 901, 270 A.3d 97 (2022). Consistent with the certified question, the defendant claims that the investigator's *Brady* review was not constitutionally adequate in this case because the state's lay investigator was not qualified to review the complainant's Spanish language journals for *Brady* material, resulting in a deprivation of the defendant's due process right to a fair trial and necessitating the reversal of his conviction. The majority cannot mean that any claim alleging an improper delegation of a prosecutor's duty to conduct a constitutionally adequate review for *Brady* material is deficient as a matter of law. Would we say that no "freestanding" *Brady* claim exists if a defendant challenges a prosecutor's use of a high school civics class to conduct the *Brady* review? The methodology used to review information for potential *Brady* material is inextricably intertwined with the integrity, reliability, and legal sufficiency of that review.

Instead of addressing the merits of the claim certified for appellate review and briefed on appeal, the majority knocks down a straw man by focusing exclusively on the

defendant's request for relief, namely, a "prophylactic," federal constitutional rule requiring the prosecutor *in all cases* personally to review potential *Brady* material that comes to light during trial.[28] The defendant's request for such a rule must be placed in the broader context of his claim on appeal. The defendant does not contend that a prosecutor's personal duty to review information for *Brady* material never is delegable; nor does he need to make such an absolutist claim to be entitled to relief. Instead, the defendant claims that the delegation was unconstitutional *in this case* because the complainant's Spanish language journals surfaced midway through the trial, after the complaining witness had completed most of her trial testimony. The defendant acknowledges the "administrative and practical problems [that] could arise from a requirement that *all* documents be personally reviewed by prosecutors, particularly since *Brady* [review] can occur long before trial, and may involve documents generated by, or in the possession of, different government agencies." (Emphasis in original.) The defendant makes it clear that he "was not and is not asking for an expansive *Brady* rule of general applicability but is seeking a limited rule to the effect that a prosecutor must personally review potential *Brady* material when that material is first discovered or uncovered during the course of the trial."

In my view, we need not decide whether to adopt the prophylactic rule sought by the defendant because a narrower holding is sufficient to remedy the constitutional inadequacy of the *Brady* review conducted in this case.

---

[28] The defendant's request for a prophylactic rule may have been unnecessary and inartful, but it does not preclude appellate review of his as applied *Brady* challenge. The majority's characterization of the defendant's claim as one seeking only a prophylactic rule and not making a case-specific challenge is also impossible to square with the defendant's allegation that there was not just the *risk* of a *Brady* violation, but an *actual Brady* violation patent on the face of the evidentiary record in this case. See footnote 26 of this opinion.

We are not bound by the scope of relief requested by the defendant. Indeed, we have the inherent authority and obligation to fashion a narrower rule consistent with the general principle "that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States* v. *Morrison*, 449 U.S. 361, 364, 101 S. Ct. 665, 66 L. Ed. 2d 564 (1981); see *Dayton Board of Education* v. *Brinkman*, 433 U.S. 406, 420, 97 S. Ct. 2766, 53 L. Ed. 2d 851 (1977) ("[o]nce a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation" (internal quotation marks omitted)). No principle of law or logic supports the idea that the defendant's request for greater relief precludes this court from granting more circumscribed relief.

As for the adequacy of the record, "[a] record is not inadequate for *Golding* purposes because the trial court has not reached a conclusion of law if the record contains the factual predicates for making such a determination." (Internal quotation marks omitted.) *State* v. *Rosa*, 196 Conn. App. 480, 499, 230 A.3d 677, cert. denied, 335 Conn. 920, 231 A.3d 1169 (2020). "Nevertheless, [i]f the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." (Internal quotation marks omitted.) Id.; see id., 499–500 (concluding that record was adequate to review defendant's unpreserved *Brady* claim); see also *State* v. *McCoy*, 331 Conn. 561, 598, 206 A.3d 725 (2019) ("this court has regularly entertained claims of *Brady* violations that were not distinctly raised at trial, as long as those claims satisfied *Golding*"); *State* v. *Bryan*, 193 Conn. App. 285, 312–14, 219 A.3d 477 (reviewing unpreserved *Brady* claim under *Golding*), cert. denied, 334 Conn. 906, 220 A.3d 37 (2019).

The pertinent facts are not disputed, unclear, or ambiguous, and the record is sufficient to permit appellate review. The complainant's Spanish language journals were marked and sealed as an exhibit and thus have been preserved for translation and review. The record is equally clear that neither of the prosecutors understood the Spanish language and that they could not review the handwritten journals for potential *Brady* material themselves. Because the prosecutors decided to delegate this task in its entirety to their bilingual investigator, they were acutely aware that it was important to establish the qualifications of the investigator conducting the *Brady* review. To this end, the prosecutors detailed those qualifications on the record, explaining that the investigator was bilingual, had been employed by the state's attorney's office for fifteen years, five of which had been spent as an investigator, and had graduated from Albertus Magnus College in 2013 with a major in criminal justice.[29] As for the instructions that the investigator had been provided, the prosecutors explained that the investigator had been "instructed very carefully . . . as far as what she was looking for . . . [and] what the state's obligation is for exculpatory and *Brady* material," and that the investigator had "spent about ten hours reviewing these materials . . . and, whenever she had any questions, she would talk to" the prosecutors assigned to the case. The record makes it clear that the prosecutors

---

[29] The majority offers hypothetical examples of situations in which a blanket prohibition on delegation would be inappropriate. See part II of the majority opinion. Those hypotheticals serve only to illustrate that the delegation was improper on the facts of *this* case. In this case, the state's investigator was not a paralegal, much less "a highly experienced paralegal who has been trained in the requirements of *Brady* and who sat by the prosecutor's side during the entire trial . . . ." Id. Nor was the investigator "a supervising prosecuting attorney who had been supplied with the transcript of the proceedings . . . ." Id. The state's investigator was a nonlawyer layperson with no apparent legal training, experience, or knowledge of the constitutional requirements of *Brady* or the complainant's prior statements or testimony.

performed no active oversight of the review process and left it to the investigator to come to them with questions.

The relevant qualifications of the state's investigator are clear from the record. The prosecutors expounded on the investigator's education, experience, and training, and it is both counterintuitive and speculative to think that the prosecutors would have omitted additional pertinent information, such as specialized training and experience in *Brady*'s requirements or the translation of foreign language documents. Reviewing the same record, the Appellate Court rightly held that "[t]he record is adequate and the defendant's claim is of constitutional magnitude, and, thus, the first two *Golding* prongs are satisfied." *State* v. *Andres C.*, supra, 208 Conn. App. 856. It is highly significant that the state does not claim otherwise; nor does the state suggest that additional information regarding the investigator's qualifications exists or that further fact finding may be necessary to supplement or augment the record. To the extent that the defendant's *Brady* claim is unpreserved, it is reviewable under *Golding*.[30]

---

[30] As the majority acknowledges, defense counsel asked for an immediate, in camera review of the complainant's Spanish language journals for exculpatory material when their existence first was disclosed at trial. See footnote 21 of the majority opinion. Because the trial court and the state were on notice of the defendant's *Brady* claim, I fail to see why the defendant should be required to renew his request for a second time to preserve it for appellate review. See, e.g., *State* v. *Best*, 337 Conn. 312, 317 n.1, 253 A.3d 458 (2020) (claim was "functionally preserved" in trial court because it was articulated with sufficient clarity to put trial court on notice); *State* v. *McKethan*, 184 Conn. App. 187, 194 n.2, 194 A.3d 293 (defendant's claim was preserved because "the trial court was placed on reasonable notice of the claim"), cert. denied, 330 Conn. 931, 194 A.3d 779 (2018). Regardless, even if the defendant's *Brady* claim is unpreserved, it nonetheless is reviewable under *Golding* because it is a claim of constitutional magnitude, and the record is adequate for review. With respect to the adequacy of the record, I join Justice D'Auria's observation that, "when it comes to *Brady* claims, this court has even pressed beyond the dictates of *Golding*'s first prong . . . at times ordering limited remands to supplement the record so that a reviewing court can determine if the state has complied with its affirmative constitutional obligation under *Brady*." Part IV of the concurring and dissenting

The majority's conclusion to the contrary is in "derogation of [a criminal defendant's] rights under *Golding*." *State* v. *Rosa*, supra, 196 Conn. App. 501. *Golding*, which "is a narrow exception to the general rule that an appellate court will not entertain a claim that has not been raised in the trial court," is premised on the animating principle that, "because constitutional claims implicate fundamental rights, it . . . would be unfair automatically and categorically to bar a defendant from raising a meritorious constitutional claim that warrants a new trial solely because the defendant failed to identify the violation at trial." (Internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 749, 91 A.3d 862 (2014). This doctrine is not available in federal court, and, therefore, the majority's reliance on federal case law to hold that *Brady* claims must be preserved in the trial court or forfeited on appeal is misplaced and undermines the foundational principles on which *Golding* rests. See, e.g., *State* v. *McCoy*, supra, 331 Conn. 598 ("the trial court is [not] the *only* court that can review a *Brady* claim"; appellate courts can review *Brady* claims under *Golding* (emphasis in original)); *State* v. *Rosa*, supra, 501 (there is no "inviolable rule that any *Brady* claim must first be fully presented and preserved in the trial court or be deemed waived").

For the foregoing reasons, I would retain jurisdiction over the present appeal and remand the case to the Appellate Court with direction to remand it to the trial court to order the journals translated into English and to review the translated journals in camera for potential *Brady* material. See, e.g., *State* v. *Ortiz*, 280 Conn. 686, 713 n.17, 911 A.2d 1055 (2006) (appellate courts may

opinion. On the present record, there is no reason why we cannot, and every reason why we can and should, exercise our discretion to remand the case to the trial court for the limited purpose of ordering an official English language translation and in camera review of the complainant's journals for *Brady* material.

remand case to trial court for hearing to determine whether *Brady* violation exists pursuant to their supervisory authority under Practice Book § 60-2); *State* v. *Gonzales*, 186 Conn. 426, 435–36, 441 A.2d 852 (1982) (remanding case to trial court to determine whether witness' prior statement was required to be disclosed to defense); see also Practice Book § 60-2 (this "court may, on its own motion . . . (1) order a judge to take any action necessary to complete the trial court record for the proper presentation of the appeal . . . [or] (8) remand any pending matter to the trial court for the resolution of factual issues where necessary"). Remand to the trial court is appropriate because that court is "already familiar with the matter" and can rapidly resolve the "fact sensitive constitutional issues" embedded in the defendant's *Brady* claim. *State* v. *Ortiz*, supra, 714 n.17. If a dispute between the parties regarding the disclosure of the journals still exists following the trial court's in camera inspection of the translated journals and its issuance of a memorandum of decision, then we may request supplemental briefing and review that dispute on appeal. See, e.g., *State* v. *Davis*, 338 Conn. 458, 478–79, 258 A.3d 633 (2021); *State* v. *Pollitt*, 199 Conn. 399, 416–17, 508 A.2d 1 (1986). In the absence of further review of the complainant's journals for material, favorable evidence, however, I cannot conclude that the defendant received a fair trial in accordance with his due process rights under *Brady*. I therefore dissent.